Billy Ray **APPERSON** and Don **Apperson, Individually and on Behalf of a Class, Plaintiffs–Appellants,**

v.

**FLEET CARRIER CORPORATION; Local 614 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America; and Fleet Carrier Dealers Service, a Michigan Corporation, Defendants–Appellees.**

No. 87–2184.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 9, 1989.

Decided July 13, 1989.

Delmer C. Gowing, III (argued), John A. Forrest, Bloomfield Hills, Mich., Ellis Boal (argued), Detroit, Mich., for plaintiffs-appellants.

A. Read Cone III (argued), Birmingham, Mich., Gerry M. Miller (argued), Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, Wis., H. Terrence Smith, Robert G. Cutler (argued), Detroit, Mich., for defendants-appellees.

Before MERRITT and NELSON, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Plaintiffs Billy Ray Apperson, his brother Don Apperson, and the class that they seek to represent, appeal the dismissals of their labor and antitrust claims against Defendants Fleet Carrier Corporation (Fleet), Fleet Carrier Dealers Service (FCDS), and Local 614 of the International Brotherhood of Teamsters, Chauffeurs, Warehouseman & Helpers of America (Union or Local 614). On appeal Plaintiffs challenge the district court's holding that they lacked standing to pursue an antitrust claim against the corporate Defendants under the Sherman Act, *see* 15 U.S.C. § 1 (1982), and argue that the court erred in finding a "final and binding" arbitration decision dispositive of their "hybrid" section 301 claim under the Labor Management Relations Act, *see* 29 U.S.C. § 185(a) (1982). We agree with the district court, however, that Plaintiffs are without standing to sue under the antitrust laws, and that they have failed to adequately demonstrate why the arbitration decision should be set aside. Accordingly, we affirm.

## I. FACTS

### A. *The Parties and the Contract*

Fleet Carrier Corp. is a trucking company engaged in the transportation of new motor vehicles, mostly for General Motors (GM), to dealerships around the country. Its principal terminal is in Pontiac, Michigan. Fleet is compensated for its services under a published tariff that varies depending on the weight of the vehicles and the distance they are transported.

Fleet Carrier Dealers Service is responsible for initially inspecting the new vehicles at GM's facility, accepting them for transportation, moving the vehicles to Fleet's terminal (approximately one-half mile away), and preparing them for shipment by Fleet. FCDS is compensated directly by GM under a contract calling for a per-vehicle "releasing and terminal handling" charge. Although FCDS and Fleet are distinct corporate entities, they share the same ownership, the same facilities in Pontiac, and some of the same directors, officers, and managers.

The Union employees of both Fleet and FCDS are represented for collective bargaining purposes by Local 614 of the Inter-

national Brotherhood of Teamsters. The Union, Fleet, and FCDS are all signatories to a collective bargaining agreement known as the National Master Automobile Transporters Agreement including the Central and Southern Conference Areas Supplemental Agreements (Contract or NMATA).

Plaintiffs,[1] who are members of Local 614, are employed by Fleet as "brokers," also known as "owner-operators." Their function is to haul the new vehicles on Fleet-owned trailers to GM dealerships across the United States and Canada. The brokers lease their own tractors (power units) to Fleet and provide driving services. They are compensated under Article 62 of the NMATA, which provides that the brokers must receive not less than "65% of gross revenue."

> Gross revenue for the purpose of this Agreement is defined as total tariff proceeds received by the carrier exclusive of all arbitrary and ancillary charges which are justified.

Art. 62 § 4(a). Under this provision, therefore, the brokers are due not only 65% of the tariff proceeds, but also 65% of any "unjustified ancillary charge" that is "received by the carrier."

Article 7 of the NMATA further provides a comprehensive grievance and arbitration procedure for

> any and all disputes, including interpretation of contract provisions arising under, out of, in connection with, or in relation to this collective bargaining agreement....

Art. 7 § 11. If the local union and the carrier are unable to resolve informally such a dispute, then it is referred to a series of local, regional, and national joint arbitration committees comprised of equal numbers of employer and union appointees. The committees decide grievances by majority vote; any tie vote, or "deadlock," causes the grievance to be taken to the next level. In the event of a deadlock at the national level, the grievance would then be referred to a board of arbitration composed of one union appointee, one employer appointee, and a third disinterested arbitrator selected jointly by the other two. A majority decision at any of these various levels "shall be final and binding on all parties." Art. 7 §§ 6 & 7(a).

### B. *The Grievance, Settlement, and Lawsuit*

This case arises from asserted manipulations of the releasing and terminal handling charge from 1978 to the present. During and before 1978, the releasing and terminal handling services were performed by Fleet employees, for which Fleet received a releasing charge of $12 per vehicle. In January of 1979, however, Fleet transferred its releasing responsibilities to its sister corporation, FCDS.[2] After the switch to FCDS, the releasing charge paid by GM increased dramatically: by February of 1982, when this lawsuit was initiated, the charge had risen to $135 per vehicle.

Fleet's brokers, in particular Plaintiff Billy Ray Apperson,[3] complained to their Union about the increased releasing charge. In the brokers' view, the releasing charge was an "ancillary charge" under Article 62 of the NMATA, and the brokers were therefore entitled to 65% of the "unjustifiable" portions of the charge. Given the quick increase in the releasing charge, they further believed that the charge could not be justified in its entirety. The brokers regarded the corporate changeover, *i.e.*, that the releasing charges were now received by FCDS instead of Fleet, as nothing more than a bookkeeping sleight of hand. They requested their Union to seek Fleet's justification so that the brokers could receive their contractually mandated compensation.

---

1. Although the proposed class was never certified by the district court, we will use the term "Plaintiffs" to include the class of "brokers" employed by Fleet during the relevant time periods. Plaintiffs do not work for FCDS.

2. Whether FCDS was a pre-existing entity or was created specifically for this purpose is not disclosed by the record.

3. When used in this Opinion, the name "Apperson" refers to Billy Ray Apperson unless otherwise noted.

The Union was initially unresponsive. Although Apperson claims that Local 614's attorney told him that Fleet's action was a "fraud," neither the Union's Business Agent, Leonard (Butch) Williams, nor the brokers' steward, Art Fink, would take the brokers' complaint to Fleet for resolution. This impasse continued until September of 1980, when Apperson became acting steward while Fink was on medical leave. On September 10, Apperson filed a "Grievance Report" in which he set forth a "policy grievance" requesting that Fleet "justify" the "ancillary charge" pursuant to Article 62 of the NMATA.

The grievance was ultimately processed by the Union. It was not resolved informally, so a hearing was convened before the local arbitration panel, the Tri–City Joint Arbitration Committee. The Tri–City Committee deadlocked, thus requiring that the grievance be heard at the regional level before the Central–Southern Area Joint Arbitration Committee. The grievance was docketed for the Central–Southern Committee meeting on August 19, 1981, in Colorado Springs, Colorado.

At Colorado Springs, a luncheon meeting was held to discuss the grievance prior to the hearing. Present at the meeting were Apperson, Union representatives Fink and Williams, members of Fleet management, Albert Matheson who was the employer-side co-chair of the Central–Southern Committee, and several members of the Committee's union-side, including co-chair Charles Thompson. Apperson claims that during lunch both Matheson and Thompson stated that they would not rule in favor of the grievance because the requested award of back pay would bankrupt the company.[4] The Union representatives therefore decided not to risk a hearing on the merits. The parties reached a tentative agreement over lunch, and the Central–Southern Committee was informed that the grievance would not be heard. The Committee approved of the parties' "settlement," subject to the understanding that a written agreement would be submitted to the Committee co-chairs at a later date. The Committee therefore retained jurisdiction over the grievance.

Upon returning to Pontiac, Fleet and Union representatives, along with the "brokers committee,"[5] met on August 25, 1981, to reduce the settlement to writing. Apperson did not attend because he was on the road for Fleet at the time. The meeting resulted in a detailed written settlement agreement (the Pontiac Agreement), in which Fleet agreed to "immediately apply for rate increase" and to grant six other desired operational changes. The Pontiac Agreement was signed by the Union representatives and a majority of the brokers committee.

When Apperson read the Pontiac Agreement, however, he determined that it was inconsistent with his understanding of the discussions in Colorado. Specifically, he thought that the Colorado agreement required an 8–10% rate increase, not simply that Fleet would apply, and that the parties had agreed to a $500 lump-sum payment for each broker, which was omitted from the Pontiac Agreement.

Because of Apperson's reservations concerning the Agreement, Business Agent Williams placed the question on the Central–Southern Committee's agenda for February 2, 1982, in Hollywood, Florida. During January of 1982, however, Fleet obtained the promised tariff increase in the amount of 7%. Williams therefore announced to the Committee at the February 2 hearing that Fleet had substantially complied with the settlement agreement, and Fleet's representative readily agreed. Apperson appeared before the Committee and argued that the grievance was not settled because the Pontiac Agreement materially altered the terms agreed upon in Colorado and Fleet had not lived up to its Colorado commitments. The Committee decided, however, that the Pontiac Agreement had settled the grievance and that Fleet's 7%

---

**4.** Whether these statement were in fact made is disputed by the Union and Fleet.

**5.** According to Apperson's affidavit, the brokers committee is a "membership-elected body of union officials whose job is to help process grievances."

tariff increase was in substantial compliance with that Agreement. The Committee again retained jurisdiction over the case.

On February 26, 1982, Apperson filed this suit against Fleet claiming a breach of contract under section 301 of the Labor Management Relations Act. *See* 29 U.S.C. § 185(a). On March 9, the First Amended Complaint was filed, in which the Union was named as a Defendant for the first time. Plaintiffs subsequently added an antitrust count, contending that Fleet, FCDS, and certain GM employees (who were not named as defendants) conspired to deny the brokers their just compensation, thereby unreasonably restraining trade in the new vehicle haulaway market. The district court dismissed the antitrust claim, however, because the Plaintiffs lacked standing to bring it.

### C. *The National Committee Decision and the District Court Disposition*

During the course of discovery on Plaintiffs' "hybrid" section 301 action, in March of 1985, the parties deposed Andrew Kubiak, who was Fleet's Vice President of Operations from 1978 until 1982. Kubiak's responsibilities included representing Fleet in the brokers' grievance over the increased releasing charges. Kubiak testified that during the course of this grievance, he was informed by Richard Kuney, who was then Vice President of Finance for Fleet,[6] that the releasing charge could not be entirely justified from a financial standpoint. Kubiak also testified that he understood the August, 1981, Pontiac Agreement to call for Fleet's immediate request for a tariff increase. He was surprised to learn from Kuney in early September, however, that Fleet would not file immediately. In December, when Fleet had still not filed for a rate increase, Kuney told Kubiak that Fleet was acting "unethically." Kuney further indicated that he could not understand Fleet's position given that, in Kuney's mind, Fleet was in a financial position to give a rate increase without going to GM for a tariff increase.

The Union considered Kubiak's testimony to be new evidence that cast doubt on the validity of the Pontiac Agreement. During the March, 1985, Central–Southern Committee meeting in Scottsdale, Arizona, Business Agent Williams and then Local 614 President John Walker met to discuss the matter with Walter Shea, an official of the International Brotherhood of Teamsters. According to Williams' affidavit, the discussions concerned only procedural questions, namely whether a new grievance should be filed or the original grievance reopened and with which Committee to file it. He claims that the parties never discussed the merits of the original releasing charge grievance with Shea.

Williams subsequently filed a grievance on April 30, 1985, requesting that the Pontiac Agreement be set aside on the following grounds:

(1) The so-called preliminary settlement of August 25, 1981 should be rescinded or set aside because entered into on the basis of Company misrepresentations of fact concerning its financial circumstances, including alleged inability to increase owner-operator's pay without raising its rates to General Motors.

(2) The Company has materially breached the August 25, 1981 settlement in several crucial respects including an over four months' delay in implementing the rate increase and failure to comply with the maximum loading commitments of the agreement.

The 1985 grievance requested that the brokers' original grievance be upheld on the merits and that the brokers be granted back pay.

The grievance was placed on the agenda for the Central–Southern Committee for November of 1985, at San Antonio, Texas. Prior to the hearing, Apperson wrote a letter to the Committee urging that it decline jurisdiction over the grievance and permit the merits to be decided in the instant litigation. Local 614 President Daniels responded by letter in which he noted that the Committee had expressly retained jurisdiction over this case in its prior deci-

---

6. Mr. Kuney is now deceased.

sions, and that the federal court lawsuit did not affect the Committee's jurisdiction.

When the grievance came up for hearing, Williams presented the Union's case. Williams read the two letters from Apperson and Daniels to the Committee; he read excerpts of the Kubiak deposition; he presented a history of the increased releasing charge; and he argued for back pay for the brokers' portion of the unjustified charges, although the amount of money owed to the brokers was not specified. Williams claims that he also argued that Fleet and FCDS were essentially the same entity, but Apperson asserts that Williams made no such argument.

Apperson was permitted to address the Committee. He again urged that the grievance should not be heard and that the merits should be determined in this lawsuit.

Ralph Thompson, appearing for Fleet, argued that the releasing charge was received by FCDS not Fleet, that the two were separate entities, and that it is customary in the industry for two related corporations to handle separately the releasing and delivery functions. Fleet also claims that Thompson alternatively argued that the grievance was settled, that the settlement was upheld by the Committee in February of 1982, and therefore, that the Committee should not reopen the grievance on the merits. Apperson asserts, on the other hand, that Thompson stated, "It's this panel's responsibility to put this case back on the docket." The Central–Southern Committee deadlocked, and the case was accordingly referred to the National Joint Arbitration Committee meeting at Chicago, Illinois, in February of 1986.

The employer-side co-chair of the National Committee was Ian Hunter, who is an attorney for Fleet. Since the Committee members must be unrelated to the parties to the grievance, Hunter stepped aside when the brokers' grievance came up and, pursuant to Committee Rule, he appointed Robert Parr, his former law partner,[7] as

employer-side co-chair for the grievance. The union-side was chaired by Walter Shea and included Charles Thompson who was involved in the initial resolution of the brokers' grievance in Colorado in August, 1981.

The parties' presentations to the National Committee lasted about two and one-half hours and largely mirrored their prior arguments before the Central–Southern Committee. Apperson addressed the tribunal by way of a prepared statement, dated the day before the hearing, in which he stated:

> I insist on a disclosure by every member or chairman of this committee of any conversations they may have had with company or union officials concerning the grievance or the suit. The company co-chair is an attorney for Fleet.
>
> . . . .
>
> With this complex background, and given the evident collaboration of the company and the union, and given the prior contacts the members and chairmen of this committee have had with the grievance and the lawsuit, I think it would be inappropriate for the National Committee to hear the grievance.

Apperson's demands went unheeded, and the National Committee took the grievance for decision.

The National Committee's written decision was handed down in June of 1986. The Committee concluded that "Fleet Carrier Dealers Service, Inc. and Fleet Carrier Corporation are separate employers," and that "[i]t is not uncommon in the industry for the releasing work to be performed by a separate company, some owned by the same holding company and others owned independently." The Committee went on to hold:

> Article 62, section 4 of the Central–Southern Supplement defines "gross revenue" to include "total tariff proceeds *received by the carrier* exclusive of all arbitrary and ancillary charges which are

7. Hunter is the law partner of Mr. Cone, who represents Fleet in this lawsuit. Both Hunter and Cone had been partners with Robert Parr, Hunter's choice as employer-side co-chair, until mid–1983, when they left the "Matheson Firm" in which Parr is still a named partner. Thus, Parr was associated with Fleet's attorney in this suit from its inception in early 1982 until Cone and Hunter left the firm one and one-half years later.

justified" (emphasis supplied). Since the grievance claims a percentage of proceeds (charges) which are not being paid to the carrier but which are being paid to a different company with its own complement of employees, the owner-operators working for Fleet Carrier Corporation have no claim to these funds (charges). Therefore, the claim for a percentage of the releasing charges being paid to Fleet Carrier Dealers Service, Inc. is denied.

Armed with this adjudication on the merits of the brokers' original grievance, Fleet, FCDS and the Union returned to federal court and moved the district court for summary judgment based on this "final and binding" decision. Plaintiffs opposed the motion contending that the National Committee's Decision was tainted by the Union's breach of its duty of fair representation, by Fleet's "repudiation" of the grievance procedure, and by the evident partiality of Committee members Parr, Shea, and Charles Thompson. The district court concluded, however, that the National Committee's Decision had resolved the contractual dispute underlying the brokers' grievance and the lawsuit, and that no genuine issue of material fact existed to support Plaintiffs' arguments that the Committee's Decision should be vacated. The court accordingly granted Defendants' motions for summary judgment. Plaintiffs moved the court to reconsider, which was denied, and this timely appeal ensued.

## II. The Antitrust Count

■ We first address Plaintiffs' contention that the district court erroneously granted the motion to dismiss their antitrust claim against Fleet and FCDS. Although the precise theory of the antitrust claim is not clear, we assume for the purposes of discussion that Fleet's conduct might have violated the antitrust laws if Fleet somehow parlayed the alleged contract breach into a mechanism to destroy competition in the new vehicle haulaway market. *Cf. Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 528 & n. 17, 103 S.Ct. 897, 903 & n. 17, 74 L.Ed.2d 723 (1983). Even given this dubious assump-

tion, however, we agree with the district court that Plaintiffs do not have standing under the antitrust laws to challenge the violation.

In determining whether any particular plaintiff has the requisite "antitrust standing," this court has interpreted the relevant Supreme Court opinions to mandate inquiry into the following factors:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and whether that harm was intended to be caused;

(2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;

(3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;

(4) the potential for duplicative recovery or complex apportionment of damages; and

(5) the existence of more direct victims of the alleged antitrust violation.

*Fallis v. Pendleton Woolen Mills, Inc.,* 866 F.2d 209, 210 (6th Cir.1989); *Province v. Cleveland Press Publishing Co.,* 787 F.2d 1047, 1050–51 (6th Cir.1986); *Meyer Goldberg, Inc. v. Goldberg,* 717 F.2d 290, 293–94 (6th Cir.1983); *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir.1983); *see Associated General Contractors,* 459 U.S. at 538–46, 103 S.Ct. at 908–13; *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472–84, 102 S.Ct. 2540, 2544–51, 73 L.Ed.2d 149 (1982).

Plaintiffs' argument in favor of finding antitrust standing hinges on their "status in the market." Although they are not consumers or competitors of Fleet, Plaintiffs nonetheless assert that they are market "participants" whose injuries are "inextricably intertwined" with the antitrust violation since they have been "manipulated or utilized by [Defendants] as a fulcrum, conduit, or market force to injure competitors." *See Fallis,* 866 F.2d at 211; *Province,* 787 F.2d at 1052; *Southaven,* 715 F.2d at 1086. We have noted, however, that status as the economic fulcrum does

not automatically confer standing. Such a finding only means that Plaintiffs are " 'not automatically preclude[d]' from bringing an antitrust action by the 'status in the market' prong of the standing test. The standing inquiry turns on a balance of several factors, not simply the plaintiff[s'] status in the market or role as an economic fulcrum." *Fallis*, 866 F.2d at 211 (quoting *Province*, 787 F.2d at 1052). Analysis of the remaining factors leads us to reject Plaintiffs' claim for antitrust standing.

The essential flaw in Plaintiffs' argument, in our view, is that their alleged injuries are in the "nature" of contract damages, not those arising from an antitrust violation. The theory underlying this antitrust complaint is premised entirely on a showing that Fleet breached its Contract with the brokers, thus causing the brokers' alleged losses, which appears to be a classic breach of contract action. Indeed, Plaintiffs assert that their damages can be ascertained "to the penny" by computing the amount they would have received if Fleet had not breached the Contract. Computation of the losses that the brokers might have incurred as a result of the *antitrust violation*, however, would be a more complex task. If, as Plaintiffs allege, Fleet was somehow able to translate the breach into an unfair competitive advantage over other carriers, Plaintiffs inevitably would have economically benefitted: Fleet would command more business from GM, which would mean that more vehicles would be transported more miles by the brokers, thus resulting in more income. Plaintiffs' theory of damages, however, ignores this potential windfall from Fleet's alleged antitrust activity, clearly showing that their real complaint is with Fleet's breach.[8] Plaintiffs' injuries, therefore, arise strictly from an alleged breach of a labor contract, a claim that rarely, if ever, would implicate antitrust laws. *Cf. Associated General Contractors*, 459 U.S. at 526–27, 103 S.Ct. at 902–03 (union's allegations of breach by employers "plainly not subject to review under federal antitrust laws"). Plaintiffs' breach of contract claim stands on its own footing—*i.e.*, they suffered "injuries that would be remediable under other laws," *id.* at 543, 103 S.Ct. at 911—and its mere inclusion in an antitrust theory does not confer standing on Plaintiffs. Accordingly, we affirm the district court's dismissal of the antitrust count.

### III. The Labor Count

Plaintiffs' more substantial complaint, therefore, was brought under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982), contending that Fleet breached its contract with the brokers by not sharing with them the unjustified portions of the increased releasing charges, and that the Union breached its duty of fair representation to the brokers in handling their grievance. The district court dismissed this "hybrid" action on summary judgment upon the authority of the "final and binding" Decision of the National Joint Arbitration Committee. Plaintiffs contend on appeal, as they did before the district court, that the National Committee Decision should be ignored because it is tainted by the Union's breach of its duty to Plaintiffs, Fleet's "repudiation" of the grievance procedure, and the evident partiality of the National Committee.

■ Our national labor policy clearly favors resolution of labor contract disputes by private mechanism: "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an

---

**8.** Viewing Plaintiffs' antitrust complaint in this light, we note that the remaining factors also weigh against their quest for antitrust standing. Since their claimed injuries do not take into account the actual economic impact of the asserted violations, it is impossible to determine the extent, if any, of Plaintiffs' damages from the violation. As a result, we cannot agree with their claim that their injuries were "caused" by the antitrust violation. Furthermore, the un-

certain and speculative nature of Plaintiffs' actual damages also convinces us that more direct victims of any antitrust violation exist, *i.e.*, Fleet's competitors. To permit Plaintiffs' antitrust claim to go forward, therefore, further raises the unseemly prospect of a double recovery against Fleet, with both potentially subject to trebling, or a complex apportionment of damages, if Fleet's competitors pursue their statutory remedy.

existing collective bargaining agreement." 29 U.S.C. § 173(d) (1982); *see Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562–63, 96 S.Ct. 1048, 1055–56, 47 L.Ed.2d 231 (1976); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). "This congressional policy 'can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.'" *Hines*, 424 U.S. at 562, 96 S.Ct. at 1055 (quoting *American Manufacturing Co.*, 363 U.S. at 566, 80 S.Ct. at 1345). For this reason, federal courts do not have plenary power to review the merits of an arbitration decision. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987); *Hines*, 424 U.S. at 563, 96 S.Ct. at 1055. Rather, the courts should defer to the agreed upon tribunal's interpretation of the contract "as long as the award draws its essence from the bargaining agreement." *Wood v. International Bhd. of Teamsters, Local 406*, 807 F.2d 493, 500 (6th Cir.1986) (citing *Enterprise Wheel*, 363 U.S. at 598–99, 80 S.Ct. at 1361–62), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); *see also United Steelworkers of America v. Timken Co.*, 717 F.2d 1008, 1009 (6th Cir.1983); *Sears, Roebuck & Co. v. Teamsters Local No. 243*, 683 F.2d 154, 155–56 (6th Cir.1982) (court may vacate award only if it displays manifest infidelity to contract), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983).

The federal courts do have the authority, however, to vacate an arbitration award in certain situations that "seriously undermine the integrity of the arbitral process...." *Hines*, 424 U.S. at 567, 96 S.Ct. at 1057. In the most familiar scenario, an employee may successfully challenge an adverse arbitration decision that is tainted by the union's breach of its duty of fair representation. *See id.* at 568, 570–71, 96 S.Ct. at 1058–60; *Vaca v. Sipes*, 386 U.S. 171, 187, 193, 87 S.Ct. 903, 915, 918, 17 L.Ed.2d 842 (1967); *Wood*, 807 F.2d at 500; *Ruzicka v. General Motors Corp.*, 649 F.2d 1207, 1212–13 (6th Cir.1981), *cert. denied*, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983). Similarly, an arbitration award may be overturned if the decision was rendered by an arbitration panel with "demonstrated bias," *Morris v. Werner–Continental, Inc.*, 466 F.2d 1185, 1190 (6th Cir.1972), *cert. denied*, 411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973); *see Early v. Eastern Transfer*, 699 F.2d 552, 558 (1st Cir.), *cert. denied*, 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1983), or "evident partiality," 9 U.S.C. § 10(b) (1982) [9]; *cf. Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (vacating arbitration award under Arbitration Act for "evident partiality" of the arbitrator). In such circumstances,[10] the aggrieved employee has been denied substantial access to the grievance procedure and has been deprived of the implicit guarantee "that the contractual machinery would operate within some minimum levels of integrity." *Hines*, 424 U.S. at 571, 96 S.Ct. at 1059. The federal courts need not defer to such arbitration awards.

Since the district court dismissed the labor count on summary judgment, the principles of Rule 56, Fed.R.Civ.P., are also

---

**9.** Although the Arbitration Act exempts labor contracts from its purview, *see* 9 U.S.C. § 1 et seq. (1982), both the Supreme Court and this court have looked to the Act's terms for guidance in reviewing labor arbitration cases. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 372 n. 9, 98 L.Ed.2d 286 (1987); *J.L. Foti Const. Co. v. Laborers' Int'l Union, Local No. 310*, 742 F.2d 994, 997–98 (6th Cir.1984); *General Telephone Co. v. Communication Workers of America*, 648 F.2d 452, 456 (6th Cir. (1981).

**10.** We do not intend this to be an exhaustive list of the situations permitting a court to vacate an arbitration award. *See, e.g., Misco*, 108 S.Ct. at 373–74 (discussing the possibility of vacating award for violating well-defined public policy); *see also infra* note 13.

pertinent. Under Rule 56(c) the district court "shall" grant summary judgment

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law.

(emphasis added). When confronted by a properly supported motion under Rule 56(c), the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–26, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 256–57, 106 S.Ct. 2505, 2509–12, 2514–15, 91 L.Ed.2d 202 (1986). For a dispute to be "genuine," there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510. The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510.

The district court applied these familiar standards to the record in this case and found no reason to vacate the National Committee Decision. The court concluded that the evidence presented by Plaintiffs failed to establish a genuine issue concerning the validity of the arbitration decision. We agree with the district court that Plaintiffs failed to establish "specific facts" to support their theories.[11] We now turn to those claims.

### A. *Fleet's "Repudiation"*

■ Plaintiffs initially assert that the National Committee Decision should be set aside due to Fleet's "repudiation" of the grievance procedure. Although Plaintiffs attempt to bolster their argument by reference to Fleet's alleged breach of the Contract and the history of the grievance until settled in the Pontiac Agreement,[12] their main complaint with Fleet's participation in the National Committee rests with the role played by Ian Hunter, Fleet's lawyer.[13] Hunter is contractually designated as the employer-side co-chair of the National Committee. Under Committee Rules, when the

---

**11.** Because we affirm the district court's holding that the National Committee Decision resolved Plaintiffs' hybrid section 301 action, we need not address the Union's alternative contention that suit was filed outside the six-month limitations period.

**12.** We note, however, that the validity of the original grievance and settlement are not directly at issue on this appeal. Whether the Union breached its duty to the brokers between 1978 and 1982, and whether Fleet's actions were in breach of the Contract, would only be addressed by a federal court if we were to determine that the National Committee Decision should be ignored.

**13.** Plaintiffs argue that Fleet's misconduct can also be seen in Ralph Thompson's statement

before the Central–Southern Committee in November, 1985, that "[i]t's this panel's responsibility to put this case back on the docket." Fleet and the Union deny that this statement was ever made. Perhaps because this was the only "specific fact" in the entire record supporting Plaintiffs' theory of a conspiracy in obtaining the National Committee Decision, however, their arguments on appeal have not focused on this claim. This tactic, we believe, was well advised, for we find no genuine issue concerning Plaintiffs' allegations of fraud and collusion. *See Morris v. Werner–Continental, Inc.,* 466 F.2d 1185, 1190–91 (6th Cir.1972) (federal court may vacate arbitration award obtained by "fraud" or "collusion"), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973); *see also* 9 U.S.C. § 10(a) (1982) (court may overturn award "procured by corruption, fraud, or undue means").

co-chair must step aside, he names his own replacement. When the brokers' grievance involving Fleet came up for hearing, Hunter therefore named Robert Parr to act as employer-side co-chair for his grievance.

Plaintiffs claim that the participation of Fleet's lawyer at this stage of the proceedings effectively "repudiated" the grievance mechanism. Although this argument does not fit within the "repudiation" framework used by the courts, *see Vaca*, 386 U.S. at 185, 87 S.Ct. at 914; *Drake Bakeries v. Local 50, American Bakery Workers Int'l*, 370 U.S. 254, 263, 82 S.Ct. 1346, 1352, 8 L.Ed.2d 474 (1962); *Garcia v. Eidal Int'l Corp.*, 808 F.2d 717, 722 (10th Cir.1986) (repudiation is "refusal to abide by contractually established grievance and arbitration machinery"), *cert. denied*, 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987), we understand Plaintiffs' contention in a more general sense: that Hunter's participation in the National Committee proceeding rendered the arbitration process substantially unavailable to the brokers. Plaintiffs contend that once Hunter determined he was unable to sit on the National Committee, he was thereby disabled from performing any arbitral function, including naming his replacement. We agree with the district court, however, that the method of choosing a replacement is a procedural matter best left for the arbitrators themselves to decide. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557–59, 84 S.Ct. 909, 918–19, 11 L.Ed.2d 898 (1964). This is particularly true, in our view, when the challenged procedure is mandated by the agreed upon Rules governing the grievance procedure.[14] Therefore, Hunter's participation in the National Committee proceeding by appointing his replacement is not assailable in its own right. Rather, his action would be cause to vacate the Committee's Decision only if it was shown that his replacement, Parr, was in fact biased

against the grievance, a question we will consider below.

### B. Union's Breach of its Duty of Fair Representation

Plaintiffs alternatively contend that the Union breached its duty to fairly represent the brokers in prosecuting the April, 1985, grievance that resulted in the National Committee Decision. They essentially argue that the Union brought the 1985 grievance solely for the purpose of achieving an adverse decision that would defeat this lawsuit. In support Plaintiffs challenge the timing of that filing, the grounds upon which the request to reopen the original grievance was based, and the Union's performance in presenting its case to the National Committee.

■ Under the duty of fair representation doctrine, the union's performance is "subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Hines*, 424 U.S. at 564, 96 S.Ct. at 1057 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)). The union can breach this duty if its handling of an employee grievance is arbitrary, discriminatory, perfunctory, or in bad faith. *See id.* 424 U.S. at 570, 96 S.Ct. at 1059; *Vaca*, 386 U.S. at 190–91, 87 S.Ct. at 916–17; *Early*, 699 F.2d at 555; *Ruzicka*, 649 F.2d at 1213. In order to justify vacating an arbitration award, however, "the breach of duty by the Union must have tainted the arbitrator's decision. The breach must have contributed to the arbitrator's making an erroneous decision." *Wood*, 807 F.2d at 500. With these principles in mind, we now address Plaintiffs' contentions.

■ Plaintiffs initially argue that because the Union's request to reopen the brokers' grievance came during the pend-

---

**14.** Plaintiffs challenge the contractual authority for Hunter's appointment of Parr, contending that such an "inherent defect" in the Committee Rules cannot save an otherwise impermissible act. They cite to support this theory a district court opinion as quoted on appeal, which the appellate court found moot and which involved a different labor statute. *See Lanigan v. Local*

*Union No. 9*, 327 F.2d 627, 628 (7th Cir.), *cert. denied*, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). Plaintiffs give us no reason to conclude, however, that a joint arbitration committee co-chair's appointment of his own replacement should always invalidate the resulting award.

ency of this lawsuit, we must infer that it was filed in bad faith to subvert this lawsuit. Plaintiffs have cited no case, however, holding that the grievance machinery must stop once a lawsuit is filed concerning the underlying grievance. Indeed, we believe that such a blanket rule would be at odds with Congress' stated preference that labor disputes be resolved by arbitration, not by the courts. *See* 29 U.S.C. § 173(d); *Hines*, 424 U.S. at 562–63, 96 S.Ct. at 1055–56. The mere filing of a new grievance while a related lawsuit is pending, therefore, cannot alone be controlling in determining the validity of the ultimate arbitration decision. Nonetheless, we believe that in such a case the federal court should closely scrutinize the union's explanation for reviving the original grievance and its performance in prosecuting the new grievance to assure itself that the union members are not deprived of their right to fair representation.

■ The 1985 grievance cited two reasons, based on the Kubiak deposition, that the Pontiac Agreement should be set aside and the original grievance decided on the merits: first, because Fleet misrepresented its financial condition in negotiations, specifically concerning its inability to increase the brokers' pay without a tariff increase; and second, because Fleet breached the settlement by delaying the rate increase for over four months.[15] Plaintiffs assert, however, that the Union must have known of the four month delay in implementing the rate increase when it occurred in January of 1982. Plaintiffs therefore claim that the Union's reliance on that breach three years later to overturn the settlement was specious and revealed its underlying moti-

vation merely to terminate this lawsuit in any manner possible.

We conclude, however, that Plaintiffs' assault on the substance of the new grievance fails to raise a genuine issue about whether the Union was justified in seeking to reopen the releasing charge grievance. Plaintiffs' objection concerning the Union's knowledge of the four month delay fails to address the alternative ground stated by the Union to support reopening the original grievance [16]: that the Pontiac Agreement itself was entered into on the basis of material misrepresentations about Fleet's financial condition. Plaintiffs have presented no evidence disputing that the misrepresentations did occur, that the financial information was material, or that the testimony given by Kubiak was "new evidence" when heard by the Union representatives. Furthermore, in a different section of their appellate brief, Plaintiffs state that Fleet "made the grievance procedure a sham" by "deceiving the Union into negotiating the supposed settlement in Pontiac." Brief of Appellant at 38.[17] Plaintiffs' failure to dispute the alternative basis, and their apparent concession as to the gravity of Fleet's alleged misrepresentation, therefore, lead us to conclude that no genuine issue exists concerning the sufficiency of the Union's reasons to seek a rehearing.

Plaintiffs next claim that the Union's representation of the brokers throughout the proceedings was a breach of its duty of fair representation. Plaintiffs particularly cite as evidence of the breach: the Union's failure to argue before the National Committee that FCDS was merely the alter ego of Fleet; the contents of the letter from Local 614 President Daniels; and the Un-

**15.** The second reason also included Fleet's alleged breach in not loading the trailers to capacity. We do not discuss this aspect of the grievance, however, because it appears to have played no part in the Union's presentation before the National Committee.

**16.** Moreover, Plaintiffs' reliance on the Union's obvious knowledge of the four month delay misses the point. The new evidence obtained from the Kubiak deposition was not the four month delay itself; it was that Fleet did not *file* for a rate increase "immediately" in August of 1981 as it had promised in the Pontiac Agree-

ment. Plaintiffs present no "specific facts" to cast doubt on the Union's contention that these revelations by Kubiak were "new evidence" of a breach.

**17.** Plaintiffs' appellate brief goes on to claim that the alleged misrepresentations were not brought to the Committee's attention, but this assertion is belied by the record. Plaintiffs do not dispute that Williams read excerpts of the Kubiak deposition to the Committee, and the relevant misrepresentations were contained in those excerpts.

ion's linking of Apperson and his attorney with the Teamsters for a Democratic Union (TDU).[18]

▮ Plaintiffs assert that Williams' failure to address the relationship between Fleet and FCDS requires that the resulting National Committee Decision be invalidated. The Union claims that Williams did in fact argue that Fleet and FCDS were the same entity. Even if the dispute over the substance of Williams' presentation created a genuine issue whether his performance was arbitrary or in bad faith, however, the dispute did not preclude the entry of summary judgment, in our view, because Plaintiffs have failed to indicate how the asserted deficiency "tainted" the arbitration Decision.

Plaintiffs have not shown how additional arguments by Williams on the relationship between Fleet and FCDS would have changed the National Committee's Decision. The Decision reveals that the Committee was well aware that the corporate relationship was a central factual question in the grievance, but the Committee held that it was not controlling; the Committee decided instead that an industry custom permitting related companies to handle separately the releasing and delivery functions would prevail. Under these circumstances, we cannot say that the alleged deficiency in Williams' argumentation "contributed to the arbitrator's making an erroneous decision," *Wood*, 807 F.2d at 500; *cf. Hines v. Local Union No. 377*, 506 F.2d 1153, 1156–57 (6th Cir.1974) (union's failure to investigate and present facts to arbitrators tainted decision), *rev'd in part on other grounds sub nom. Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). Accordingly, summary judgment could not be defeated on this ground.

▮ Plaintiffs also make two objections to Williams' reading of the letter sent by Local 614 President Daniels to the Committee, which was in response to Apperson's letter requesting that the Committee not hear the grievance. First, they argue that the letter undermined the grievance by deriding this lawsuit as an attempt by Apperson to enforce "his *own* interpretation of Art. 62, Sec. 4 of our contract" (emphasis in original), which was the same interpretation that the Union was asserting in the 1985 grievance. We believe, however, that this lone statement does not seriously call into question the quality of the Union's representation. In the language immediately following the above quote, Daniels said that the Contract

vests the exclusive authority to interpret this section in the Committees and if necessary a neutral arbitrator.

Unlike Mr. Apperson, who appears to think he has the right to take advantage of those contract provisions he likes and to reject the others, we have brought the continuing dispute with the Company over the meaning of Art. 62, Sec. 4 before the tribunals we have *agreed* will decide such issues and which federal labor law favors because they have more industry, labor relations and contractual expertise than most courts.

(emphasis in original). Daniels' letter, therefore, cannot be fairly read to dispute the Union's position in the grievance, but is more reasonably understood as rebuking Apperson's contention that the merits

---

**18.** Plaintiffs also contend that the Union breached its duty by not using information at the arbitration that then President Walker had at his disposal in April, 1985. According to the affidavit of H.C. Hulett, a Business Agent with a different Local, Walker told him that a Scottsdale man connected with GM releasing had received a very expensive automobile, and that this information "might pull the local out of" this lawsuit. Plaintiffs claim that the Union's failure to bring this "bribe" to the attention of the National Committee was a breach of its duty of fair representation. On this record, however, we are unable to agree. Based on this scant description of the Scottsdale man, it is impossible to determine whether the Union's decision not to rely on this information was arbitrary or in bad faith. Moreover, Plaintiffs have failed to indicate how the decision not to use this information might have "tainted" the National Committee's Decision on the merits. *See Wood*, 807 F.2d at 500. Information of this alleged bribe would appear to have little relevance to the question of whether a releasing charge received by FCDS must be divvied up with Fleet's brokers. The Committee's Decision, therefore, is not assailable on this ground.

should be decided in the courts. Accordingly, this evidence does not create a genuine issue whether the Union breached its duty to the brokers.

The other aspect of the Daniels' letter that Plaintiffs find objectionable is its gratuitous reference to the Teamsters for a Democratic Union, a dissident group made up of Teamster members seeking changes in Union policies. Daniels' letter stated that his copy of Apperson's letter

> came in an envelope bearing the letterhead of one Ellis Boal, a lawyer who is representing Mr. Apperson in the lawsuit to which the letter refers and also regularly represents TDU and its dissidents in the Detroit area.

Even if this vague reference to TDU can be considered improper, however, we do not believe that it is alone cause to invalidate the grievance process. Rather, the TDU reference would be a ground for vacating the National Committee Decision only if it can be shown to have resulted in the arbitrators deciding the case on a basis other than the merits. Thus, as with Plaintiffs' objection to Hunter's appointment of Parr as employer-side co-chair, this question is more properly considered under Plaintiffs' claims that the National Committee was biased, which we now address.

## C. *"Evident Partiality" of the National Committee*

■ Plaintiffs argue that the National Committee's Decision should be invalidated due to the "evident partiality" of Committee members Thompson, Shea, and Parr. This court has indicated that an arbitration decision could be vacated if the arbitrators had a "demonstrated bias," although we have not attempted to formulate a standard to decide such challenges. *See Morris v. Werner–Continental, Inc.,* 466 F.2d 1185, 1190 (6th Cir.1972), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973). The district court therefore looked to the

Arbitration Act for guidance, *see supra* note 9, and adopted the provision permitting an arbitration award to be vacated for "evident partiality" of the arbitrators. 9 U.S.C. § 10(b); *cf. General Telephone Co. v. Communication Workers of America,* 648 F.2d 452 (6th Cir.1981) (adopting 9 U.S.C. § 10 as standard to review arbitration awards in labor cases). Moreover, the district court adopted the standard announced by the Second Circuit in *Morelite Const. Corp. v. New York City District Council Carpenters Benefit Fund,* 748 F.2d 79 (2d Cir.1984), in which the court stated that evident partiality "will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* at 84; *accord Toyota of Berkeley v. Automobile Salesmen's Union, Local 1095,* 834 F.2d 751, 755–56 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988). In arriving at this conclusion, the Second Circuit expressly rejected the lesser standard of an "appearance of bias" and the more exacting standard of "proof of actual bias" to justify invalidating the arbitrators' award.[19] We agree with the *Morelite* court's analysis; accordingly, to invalidate an arbitration award on the grounds of bias, the challenging party must show that "a reasonable person would have to conclude that an arbitrator was partial" to the other party to the arbitration. *See also Sheet Metal Workers Int'l Ass'n Local 420 v. Kinney Air Conditioning,* 756 F.2d 742, 745–46 (9th Cir.1985) (appearance of impropriety insufficient; "a reasonable impression of partiality" required); *Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 681–82 (7th Cir.) ("circumstances must be powerfully suggestive of bias"), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).

■ We further agree with the district court's holding that, as a general rule, a

---

**19.** Plaintiffs object to the Second Circuit's construction of the evident partiality language, contending that the plurality opinion in *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), mandates the conclusion that arbitrators must avoid even the appearance of impropriety. We agree with the Second Circuit in *Morelite,* however, that in view of Justice White's concurrence in *Commonwealth Coatings, id.* at 150, 89 S.Ct. at 340, the plurality's appearance of bias discussion should be considered dicta. *Morelite,* 748 F.2d at 82–84.

grievant must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts. *See Sheet Metal Workers*, 756 F.2d at 746; *Early v. Eastern Transfer*, 699 F.2d at 558. The successful party in the grievance may not rely on the failure to object for bias, however, unless "[a]ll the facts now argued as to [the] alleged bias were known ... at the time the joint committee heard their grievances." *Id.; see United Steelworkers of America Local 1913 v. Union R.R. Co.*, 648 F.2d 905, 913 (3d Cir.1981) ("When the reasons supporting an objection are known beforehand," failure to object will not be excused).

In light of these principles, we believe that the district court was clearly correct in refusing to consider Plaintiffs' objections to the impartiality of Charles Thompson, who was a union-side member of the National Committee. Plaintiffs contend that Thompson was biased due to his prior participation in the Central–Southern Committee that heard the renewed grievance in November of 1985, and due to his alleged hostility to the original grievance which he exhibited in Colorado in August, 1981. Apperson was present during both meetings, however, so his failure to object specifically to Thompson at the National Committee hearing on these grounds cannot be excused.

Plaintiffs' current objections to Walter Shea, who was the union-side co-chair of the Committee, suffer for similar reasons. Plaintiffs claim that Shea's bias can be seen by his participation in the March, 1985, meeting with then Local 614 President Walker and Business Agent Williams at which the new grievance was discussed, and by his circulation of a Washington Times newspaper article in December, 1985, to members of the National Automobile Transporters Union Negotiating Committee, which was captioned "TDU Exposed by National Newspaper" and went on to note that the article "exposes" Wall Street and Marxist influences on the TDU. Both of these events occurred well before the February, 1986, National Committee hearing, but Apperson made no objection to Shea on these grounds. Plaintiffs' ability to challenge Shea's partiality in federal court, therefore, depends on Apperson's knowledge of these facts underlying the allegation of bias. The record, however, is devoid of any indication when Apperson learned of these events. Since Plaintiffs had the burden to set forth "specific facts" to defeat summary judgment in this case, *see Celotex*, 477 U.S. at 322–26, 106 S.Ct. at 2552–54; Fed.R.Civ.P. 56(e), their failure to assert facts from which we could find that Apperson did not learn of Shea's alleged bias until after the hearing supports the district court's conclusion that Plaintiffs waived their objections to Shea.[20]

Plaintiffs lastly object to Robert Parr, who Hunter named as employer-side co-chair for the grievance. From February of 1982, when this lawsuit was instituted, until mid–1983, when Hunter and A. Read Cone (Fleet's attorney in this suit) left the "Matheson Firm," Parr was a partner in the firm with Hunter and Cone. Plaintiffs claim that this prior relationship disabled Parr from sitting on the Committee reviewing the instant grievance. The district court concluded that Plaintiffs failed to raise this objection before the National Committee, thereby waiving it, and alterna-

**20.** Moreover, even if we were to disagree with the lower court's waiver holding, we would reject Plaintiffs' challenge to Shea's impartiality. Shea's partiality is clearly not shown by his participation in the March, 1985, meeting with Williams and Walker, which concerned only procedural aspects of the grievance and not the merits, according to the only relevant evidence in the record. In addition, we do not believe that Shea's mailing of an anti-TDU newspaper article rendered him biased against this grievance. The reference in Daniels' letter to attorney Boal's TDU affiliation at most could indicate that Apperson was also connected with TDU. The grievance before Shea, however, involved not only Apperson, but 300 other brokers whose union politics were never divulged. Plaintiffs give us no reason to believe that Apperson's TDU affiliation rendered Shea biased against all the brokers. We have no reason to conclude, therefore, that Shea's consideration of the grievance involved anything besides the actual merits. Accordingly, we find no genuine issue concerning whether a "reasonable person would have to conclude that" Shea was biased against the brokers.

tively that these facts do not amount to evident partiality.

We believe that the district court viewed Apperson's objection before the National Committee too narrowly. He specifically stated that "[t]he company co-chair is an attorney for Fleet," in his statement to the Committee. Although this statement was drafted the day before the hearing, and thus originally referred to Hunter, Apperson stated in his affidavit that he saw no reason to change it when Parr was appointed because, as far as he knew, Parr was also an attorney for Fleet due to his association with Hunter and Cone as a named partner in the Matheson Firm. At the time of the hearing, the attorneys were no longer partners, but Apperson has affirmatively demonstrated that he was unaware of this formality. Under these circumstances, we believe that Apperson's objection, which presented the allegations of bias to the extent that he knew them, was sufficient to save the issue of Parr's partiality. This disagreement with the district court is of little consequence, however, since we agree with the court's alternative holding that specific facts of bias were not shown.

■ Parr's prior relationship with Hunter and Cone does not alone suffice to vacate the National Committee's Decision. We recognize that Parr's participation on the Committee deciding a grievance in which his former law partners were involved during their partnership would raise an appearance of impropriety requiring a federal judge's recusal from a case. *See* 28 U.S.C.A. § 455(a) & (b)(2) (Supp.1988). As we held above, however, more than the "appearance" of bias is required to disqualify an arbitrator. *See Morelite*, 748 F.2d at 84; *cf. Commonwealth Coatings*, 393 U.S. at 150, 89 S.Ct. at 340 (White, J., concurring) (arbitrators not held to same standard as Article III judges). In this case Plaintiffs have failed to show facts supporting

their contention that a reasonable person would find Parr partial to Fleet. Specifically, there is no evidence in this record that Parr had any personal interest in or knowledge of the brokers' original grievance or this lawsuit prior to his appointment as co-chair. Plaintiffs do not deny that Parr never worked on this case while Hunter and Cone were his partners. In addition, the partnership in question was terminated over two and one-half years before the National Committee Decision. In that interim, the new "Matheson Firm," with which Parr was still a named partner, billed Fleet for exactly one hour of work for $100 concerning the retrieval of documents in the firm's possession; again, however, this work was not performed by Parr. On this record, therefore, we must conclude that Parr did not work on this case before Hunter and Cone left the firm, that he did not work on any Fleet matter after they left the firm over 2½ years before the hearing, that Parr had no personal knowledge of this dispute prior to the Committee hearing, and that he had no financial interest in the grievance or this litigation. Indeed, Plaintiffs have adduced no evidence suggesting that Parr has ever personally performed legal services for Fleet. Under these circumstances, we do not believe that Parr's prior association with Hunter and Cone necessarily rendered him unable to arbitrate the instant dispute. *See Sanford Home for Adults v. International Federation of Health Professionals, Local 6*, 665 F.Supp. 312 (S.D.N.Y. 1987) (rejecting argument that business relationship between arbitrator and party's counsel required that arbitration award be vacated)[21]; *cf. Commonwealth Coatings*, 393 U.S. at 145–50, 89 S.Ct. at 337–40 (failure to disclose arbitrator's ongoing business relationship with one party, including work on project involved in the arbitration, justified setting aside award). These facts

---

**21.** The *Sanford Home* court also listed three factors that normally would enter into the "evident partiality" calculus:

    (1) the financial interest the arbitrator has in the proceeding;

    (2) the directness of the alleged relationship between the arbitrator and a party to the

arbitration proceeding; (3) and the timing of the relationship with respect to the arbitration proceeding.

665 F.Supp. at 320. For essentially the same reason discussed in the text, consideration of these factors leads to the conclusion that Parr was not evidently partial.

do not amount to the "outright chicanery" against which Justice White warned in *Commonwealth Coatings. Id.* at 150, 89 S.Ct. at 340 (White, J., concurring). Accordingly, we agree with the district court that a reasonable person would not conclude that Parr was partial to Fleet on this grievance.

### D. *Conclusion*

We conclude that Plaintiffs have failed to set forth the specific facts sufficient to raise a genuine issue on any of their contentions to set aside the National Committee Decision.[22] The district court correctly held, therefore, that the Committee's "final and binding" Decision settled the breach of contract question adversely to Plaintiffs, and judgment against Plaintiffs was properly granted.

### IV.

For the foregoing reasons, the district court's grant of summary judgment on the labor count and its dismissal of the antitrust claim are AFFIRMED.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

Although I agree with the majority that Apperson lacked standing to assert his antitrust claim, I believe that the majority, like the District Court, has decided disputed issues of fact in its approval of the grant of summary judgment with regard to his Labor claim. Consequently, I dissent from the majority's conclusion that Apperson failed to adequately demonstrate disputed issues of fact concerning the claim that the arbitration decision should be set aside on grounds of bias.

Summary judgment is appropriate only when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In this case, however, as the majority opinion itself demonstrates, Apperson advanced facts relevant to the existence of bias in the composition of the National Committee and to the existence of bad faith on the part of the Union. The trial judge was in fact required to weigh the evidence in order to grant summary judgment on the question of Parr's bias.

The error of the court below is even more evident in its ruling on the breach of the duty of fair representation claim. Relying on defendants' affidavits and ignoring plaintiffs' contradictory affidavits, the District Court found that the Union had raised before the National Committee the issue whether Fleet Carrier and FCDS were separate companies. It is strange immediately thereafter to read in the District Court's order, "On the basis of these facts, the Court concludes that plaintiffs' allegations have not created a genuine issue of material fact as to whether [the

---

22. Plaintiffs finally contend that the district court erred by entering judgment without permitting further discovery so they might acquire the requisite "specific facts." The scope of discovery, however, is generally left to the sound discretion of the district court. *See Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981); *H.K. Porter Co. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1119 (6th Cir.1976). In the instant case, the court entered judgment more than one year after the summary judgment motions were filed and one and one-half years after the contested National Committee hearing. We believe that this period should have been more than sufficient for Plaintiffs to amass the necessary evidence with which to oppose the summary judgment motions.

Moreover, the district court's written opinion acknowledged that it may not have had the benefit of full discovery and stated that the labor count would be reinstated "should it be warranted pursuant to discovery." In response to Plaintiffs' claim that they were "unclear" how to proceed, the court's decision denying their motion to reconsider clarified that reinstatement might be appropriate if discovery that had not been filed before the entry of judgment showed the existence of a genuine issue of material fact. Plaintiffs declined to take advantage of this invitation, however, though they had accumulated discovery that had not yet been filed with the court. (This fact is highlighted by Plaintiffs' reliance on deposition testimony before this court that was never filed with the district court). In addition, Plaintiffs never brought to the court's attention the issues that they believed needed further investigation or what specific discovery they wished to undertake. *Cf.* Fed.R.Civ.P. 56(f); *Willmar Poultry Co. v. Morton–Norwich Products, Inc.,* 520 F.2d 289, 297 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). Under these circumstances, we find no abuse of discretion in the court's entry of judgment.

Union representative's] conduct amounted to unfair representation." *Apperson v. Fleet Carrier Corp.*, No. 82–70719, at 18 (E.D.Mich. Sept. 30, 1987). It is stranger still to read in the very next sentence that plaintiffs might be able to establish a genuine issue of material fact by pursuing further discovery and that they would be permitted to reassert their unfair representation claim pursuant to such discovery. The proper solution to the dilemma which evidently vexed the District Court was not to issue summary judgment on improperly made findings of fact and then to attempt to soften the effect of this final judgment, but to deny defendants' summary judgment motion outright and to permit discovery to proceed.

These disputed issues of fact preclude summary judgment and mandate trial on the merits. I would reverse the grant of summary judgment with regard to the second set of claims and remand for trial.