999 F.2d 544
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
NORDELL INTERNATIONAL RESOURCES, LTD. Plaintiff-Counter-Defendant,
v.
TRITON INDONESIA, INC.; Triton Energy Corporation; Triton
Oil (NZ) Ltd., Defendants-Counter-Plaintiffs-Third
Party Plaintiffs-Appellees.
v.
VERONEX RESOURCES LTD., Third-party-defendant-Appellant.
NORDELL INTERNATIONAL RESOURCES, LTD.,
Plaintiff-Counter-Defendant-Appellant,
v.
TRITON INDONESIA, INC.,; Triton Energy Corporation; Triton
Oil (NZ) Ltd. Defendants-Counter-Plaintiffs-Third
Party-Plaintiffs-Appellees.
NORDELL INTERNATIONAL RESOURCES, LTD., Plaintiff-Counter-Defendant,
Veronex Resources Ltd., Third-Party-Defendant-Appellant,
v.
TRITON INDONESIA, INC.; Triton Energy Corporation; Triton
Oil (NZ) Ltd.
 Nos. 92-55058, 92-55433 and 92-55434.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 6, 1993.
Decided July 23, 1993.
 
 Before WALLACE, Chief Judge, and O'SCANNLAIN and FERNANDEZ, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 We must consider issues concerning the extent of an arbitration panel's authority in resolving a contractual dispute.
 
 
 3
 * In 1988, appellant Nordell International Resources, Ltd. ("Nordell") entered into a contract with appellee Triton Indonesia, Inc., a newly created, wholly-owned subsidiary of appellees Triton Energy Corporation and Triton Oil Limited (collectively "Triton"). The contract consisted of two integrally related agreements, the Farmout Agreement and the Joint Operating Agreement, which provided for the assignment to Triton of an undivided participating interest of 60% in an oil production field in Sumatra, Indonesia. Veronex Resources, Ltd. ("Veronex"), the parent corporation of Nordell, ratified the agreement.
 
 
 4
 Pursuant to the contract, Triton became the operator of the project with full responsibility for the technical, operational, managerial, financial and accounting aspects of the project. Triton was obligated to invest a disputed amount into the project, either $21 million or $24 million, after which Nordell and Triton were to contribute their proportionate share of the operating costs.
 
 
 5
 In November 1989, Nordell and Triton began to have disagreements over Triton's accounting practices, and Nordell demanded arbitration. During this time, Nordell refused to pay the cash calls demanded by Triton for the operation of the project. Nordell brought several claims against Triton, and Triton counterclaimed. Each party requested a complete forfeiture of the other party's interest in the project, indicating that the relationship had deteriorated to such a degree that working together had become impossible.
 
 
 6
 The arbitration proceeding was held for three weeks in Singapore in October 1990 before a three-member panel from the American Arbitration Association. The arbitrators found in favor of Triton, and ordered Nordell to pay Triton approximately $1 million for cash calls and damages. The arbitrators entered the award against Veronex as well, finding that Veronex was the alter ego of Nordell. Finally, the arbitrators redistributed the interests of Nordell and Triton in the project.
 
 
 7
 In December 1990, Nordell filed a motion to vacate the arbitration award in the Central District of California. In January 1991, Triton filed a motion to confirm the award against Nordell and Veronex. In February 1991, the district court denied Nordell's motion to vacate and stayed Triton's motion to confirm pending remand of three specific issues for clarification by the arbitration panel, one of which was the reasons for granting relief against Veronex.
 
 
 8
 In August 1991, the arbitration panel issued its clarification. The district court confirmed the award in its entirety. Nordell appeals, arguing that the arbitration panel (1) exceeded its authority by disregarding the plain language of the contract; (2) exceeded its authority by relying on fraudulent financial data in crafting the award; (3) exceeded its authority by redistributing the interests of the parties in the project; and (4) engaged in misconduct and was partial to Triton. Veronex also appeals, arguing that the arbitration panel did not have the authority to enter a judgment against it.
 
 II
 
 9
 The review of an arbitration award by a court is extremely limited. Section 10(a) of the Federal Arbitration Act provides that an award may be vacated only if one of the following conditions is met:
 
 
 10
 (1) Where the award was procured by corruption, fraud or undue means.
 
 
 11
 (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
 
 
 12
 (3) Where the arbitrators were guilty of misconduct in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
 
 
 13
 (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.
 
 
 14
 9 U.S.C. § 10(a). We have interpreted this section narrowly, holding that "confirmation is required even in the face of erroneous ... misinterpretations of law." French v. Merrill Lynch, 784 F.2d 902, 906 (9th Cir.1986) (citation omitted). "An arbitrator's decision must be upheld unless it is 'completely irrational' or it constitutes a 'manifest disregard of the law.' " Id. (citation omitted).
 
 III
 
 15
 * Nordell argues that the arbitrators disregarded the plain language of the contract and thus exceeded its authority under section 10(a)(4) of the Federal Arbitration Act.
 
 
 16
 A court has no authority to vacate an award solely because of an alleged error in contract interpretation. Employers' Ins. of Wausau v. National Union Fire Ins. Co., 933 F.2d 1481, 1486 (9th Cir.1991); San Martine Companie de Navegacion S.A. v. Saguenay Terminals, Ltd., 293 F.2d 796, 800 (9th Cir.1961); see also Bernhardt v. Polygraphic Co. of America Inc., 350 U.S. 198, 203 n. 4 (1956) ("[W]hether the arbitrators misconstrued a contract is not open to judicial review"). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworks Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). "The arbitrator may not ignore the plain language of the contract," id., but, "if on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced." George Day Constr. Co. v. United Bhd. of Carpenters & Joiners, Local 354, 722 F.2d 1471, 1477 (9th Cir.1984).
 
 
 17
 The disputed issue here is whether Triton had an obligation to make cash calls or joint interest billings ("JIBs") to itself. Each month, as operator of the project, Triton would prepare a statement estimating the costs and expenses for the coming month. Triton would then issue a "cash call" to Nordell, requesting its 40% share of the estimated expenses in cash, up front. At the end of the accounting period, Triton would issue JIBs accounting for the actual expenditures. Nordell contends that Triton had an obligation to issue cash calls to itself, and thus also contribute its share before the expenses came due.[1]
 
 
 18
 The arbitrators concluded that Triton had no obligation under the contract to issue cash calls to itself. Nordell argues that this conclusion disregards the plain language of section 7.4 of the Farmout Agreement and section 2(c) of the Joint Operating Agreement Annex (Accounting Procedures).
 
 
 19
 Section 7.4 of the Farmout Agreement provides:
 
 
 20
 [E]ach party shall bear and pay its undivided participating interest share of all ... costs and expenses under the [Joint Operating Agreement]
 
 
 21
 Section 2(c) of the Joint Operating Agreement Annex provides:
 
 
 22
 The parties shall advance to the operator their share of the required funds.
 
 
 23
 Nordell argues that because section 2(c) uses the term "parties" and not "party," and because Nordell and Triton are the only two parties to the agreement, the contract requires both Nordell and Triton to advance the funds through cash calls. Nordell further argues that any other interpretation of those provisions is "implausible" and thus grounds for vacation.
 
 
 24
 Triton presented evidence of the following to the arbitrators:
 
 
 25
 (1) The parties did not intend to require Triton to make cash calls on itself. Instead, the parties agreed that Triton as operator would have the right to receive contributions from non-operators for the non-operators' share of expenses. Triton, as operator, would then have the obligation to pay 100% of the costs of the project as they were incurred.
 
 
 26
 (2) The term "parties" instead of "party" was used in section 2(c) because the parties contemplated that Nordell at some point might assign a portion of its participating interest to an outside investor.
 
 
 27
 (3) The custom and practice in the oil and gas industry was consistent with Triton's understanding of the contract. Under the typical Joint Operating Agreement in the oil and gas industry, the operator has the right to receive payment in advance of each non-operator's share of the costs upon demand, but the operator itself does not have to make the payments until the bills come due. The operator has no obligation to make cash calls on itself.
 
 
 28
 The arbitrators concluded that Triton had no obligation to make cash calls on itself. Viewed in light of Triton's arguments, this construction of the contract is a plausible interpretation of the contract provisions, and we must uphold it.[2]
 
 B
 
 29
 Nordell argues that the arbitrators exceeded their authority by relying on fraudulent financial data in crafting the award, and that, accordingly, the award is irrational and must be vacated under section 10(a)(4) of the Arbitration Act.
 
 
 30
 Nordell presented much evidence to the arbitrators about the allegedly fraudulent accounting practices of Triton. The reliability of Triton's data was a hotly contested factual issue during the proceedings. By relying on the data in the face of allegation of fraud, the arbitrators implicitly made a factual finding that the data were reliable.
 
 
 31
 In arguing now that, as a matter of fact, the data were fraudulent, Nordell is asking this court to make a factual finding contrary to that made by the arbitrators. We "may not predicate reversal on the arbitration panel's erroneous findings of fact." Employers Ins. of Wausau v. National Union Fire Ins. Co., 933 F.2d 1481, 1486 (9th Cir.1991). Rather, we are "bound by the arbitrators' factual findings," South East Atl. Shipping, Ltd. v. Garnac Grain Co., 356 F.2d 189, 192 (2d Cir.1966), unless the award is based on findings wholly without support in the record. Compare Amalgamated Meat Cutters v. Great W. Food Co., 712 F.2d 122, 123 (5th Cir.1983) ("This court will not review the factual findings or merit determinations made in an arbitration award.") and International Union of Elec. Radio v. Ingram Mfg., 715 F.2d 886, 890 (5th Cir.1983) ("[a]bsent a showing of fraud or bias or prejudice [on the part of the arbitrators], the courts have no power to review findings of fact of arbitrator"), cert. denied, 466 U.S. 928 (1984) with National Post Office Mailhandlers, Watchmen, Messengers and Group Leaders Div. v. United States Postal Serv., 751 F.2d 834 (6th Cir.1985) (vacation proper where arbitrator based its holding on erroneous finding that an employee had pleaded guilty to an offense before his employer terminated him when in fact he had pleaded guilty after; date of employee's termination and the date on which he pleaded guilty were clear from the record and not in dispute). The Third Circuit summarized the extremely deferential standard of review as follows:
 
 
 32
 [R]eview of arbitrator's factual findings is not whether those findings were supported by the weight of the evidence or even whether they are clearly erroneous. All that is required is some support in the record. When the court finds some support, the inquiry is over.
 
 
 33
 Tanoma Minn. Co. v. Local Union No. 1269, UMWA, 896 F.2d 745, 748 (3d Cir.1990) (emphasis added; citations omitted).
 
 
 34
 Triton points to testimony by several witnesses that Triton's accounting practices were lawful and reliable as support for the arbitrators' reliance on the disputed data. This testimony is enough to provide "some support" for the arbitrators' implicit finding that the data were reliable. Having found some support in the record, our inquiry is over and the arbitrators' implicit finding must stand.
 
 
 35
 That the finding was implicit, not explicit, is not important. Arbitrators are not required to make explicit factual findings, nor is an arbitrator's award entitled to less deference when its findings are not explicit. See McKesson Corp. v. Local 150 IBT, 969 F.2d 831, 833-34 (9th Cir.1992); Western Employers Ins. Co. v. Jefferies & Co., 958 F.2d 258, 261 (9th Cir.1992). The Eighth Circuit rejected an argument similar to Nordell's in Osceola County Rural Water Sys. v. Subsurfco, 914 F.2d 1072 (8th Cir.1990). In that case, the district court found that the award in favor of Subsurfco violated public policy because the arbitrators ignored testimony that test results had been falsified. The Eighth Circuit reversed, holding:
 
 
 36
 [A]rbitrators are not required to elaborate on the reasons in support of an award. There is nothing in the record to suggest that the arbitrators accepted as true the testimony ... regarding the falsification of test results.
 
 
 37
 Id. at 1075. Here, similarly, the arbitrators were not required to explain the reasons for rejecting Nordell's allegations before the award is entitled to the deference outlined above.[3]
 
 C
 
 38
 Nordell argues that the arbitration panel exceeded its authority under section 10(a)(4) by reforming the agreement between the parties. An arbitrator exceeds its authority when it decides issues not submitted to it or acts in manifest disregard of the law.
 
 
 39
 Here, both Nordell and Triton asked the arbitration panel, through the exercise of equitable powers, to redistribute the interests of the parties in the project. Throughout the arbitration proceedings, Nordell requested a "divorce" from Triton, arguing that the parties could no longer work together. Nordell emphatically argued that the arbitrators had the power to redefine the roles of the parties and, in fact, argued that the arbitrators had the authority to order the complete forfeiture of Triton's interest in the project. In response to each party's request for equitable relief, the arbitrators made the following award:
 
 
 40
 [I]n view of both parties' request for an adjustment of the interest of each in the project and in view of Nordell's demonstration of bad faith in not paying Cash Calls and incessant harassment of Triton's operations, Nordell's (and Veronex's) interest in the ENIM project ... [will] be converted to a "net profits" interest in the project in the amount of five percent (5%) of the net profits realized each year from the project as determined in accordance with generally accepted accounting principles applied on a consistent basis.
 
 
 41
 Since the parties asked for the redistribution of their interests, granting that remedy was within the scope of submission. Moreover, ordering the particular remedy was within the broad equitable powers of the arbitrators. The agreement between Triton and Nordell expressly incorporated the Committee Rules of the American Arbitration Association. Rule 43 provides: "Scope of Award: The Arbitrator may grant any remedy or relief which the Arbitrator deems just and equitable within the scope of the agreement of the parties." Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1062-63 (9th Cir.1991) (quoting Rule 43). The contract contained provisions allowing forfeiture as a remedy for breach by either party; an award that adjusts the interests of the parties but falls short of full forfeiture is "within the scope of the agreement of the parties."
 
 
 42
 Nordell argues that notwithstanding the general powers of arbitrators to enter equitable remedies, the specific remedy imposed here exceeded the powers of the arbitrators because it amounted to the imposition of punishment for the violation of an interim order that itself was beyond the powers of the arbitrators to enter. At the time the dispute arose, Nordell had stopped making cash call payments. After the arbitration began, Nordell asked the arbitrators to enter an interim order precluding Triton from issuing cash calls to Nordell during the pendency of the arbitration proceedings. The arbitrators refused to enter Nordell's requested order, and instead, issued an interim order requiring the parties to continue to fulfill their obligations under the contract "so as not to alter the status quo or position of any other party."[4] Nordell continued to refuse to make cash call payments after the order was entered. The arbitrators found that this amounted to a violation of the interim order.
 
 
 43
 Nordell argues that the issuance of the order was improper and that Nordell may not be penalized for the violation. Contrary to Nordell's assertions, however, it is not clear whether the arbitrators fashioned the remedy at issue here because Nordell had violated the order. It is clear, in contrast to Nordell's contention, that the violation of the interim order was not the sole reason for the imposition of the remedy. The arbitrators gave three reasons for the redistribution: (1) both parties had requested an adjustment of the interests; (2) Nordell had demonstrated bad faith in not paying the cash calls; and (3) Nordell had incessantly harassed Triton in its operations. We need not determine, however, precisely what effect that violation of the interim order had on the remedy, because the imposition of the interim order was, in fact, within the arbitrator's power.
 
 
 44
 Nordell argues that issuance of the interim order was improper for two reasons: first, the interim order violated the status quo and an arbitrator may issue interim relief only to maintain the status quo, and second, the order was unconstitutionally vague and thus imposing penalties for its enforcement infringes upon Nordell's rights under the Due Process Clause.
 
 
 45
 Rule 34 of the Commercial Arbitration Rules of the AAA provides:
 
 
 46
 The Arbitrator may issue such orders as may be deemed necessary to safeguard the property which is the subject matter of the arbitration without prejudice to the rights of the parties or to the final determination of the dispute.
 
 
 47
 Nordell argues that this provision indicates that an arbitrator may only enter an interim order to protect the status quo, and further, that the order here was not designed to maintain the status quo because at the time the order was entered, Nordell had stopped making its cash call payments. This argument has no merit. Even if Rule 34 defined the limits of the powers of arbitrators to enter interim relief, and even accepting Nordell's interpretation of the rule, the status quo at the time that the order was entered was that Nordell had the obligation to make the cash call payments. The order was intended to reinforce those obligations and thus maintain the legal status quo. Additionally, the cash call payments were necessary to the ongoing operation of the project. By requiring Nordell to continue making the payments, the arbitrators apparently intended to protect both parties' interests in the project.
 
 
 48
 Nordell also argues that the order was unconstitutionally vague. However, the order merely required the parties to comply with their obligations under the contract. Nordell was aware that it had the obligation to pay cash calls. In fact, the arbitrators reminded Nordell of that fact several times after the interim order was entered. The order was not vague.
 
 
 49
 In sum, we conclude that the interim order was properly entered. We further conclude that the redistribution remedy was within the arbitrators' power.
 
 D
 
 50
 * Nordell argues that the award must be set aside because of misconduct on the part of the arbitration panel. Nordell specifically alleges that the arbitrators failed to allow it to submit evidence in response to the supplemental presentation that Triton prepared at the arbitrators' request on the issue of damages.
 
 
 51
 Section 10(a)(3) of the Federal Arbitration Act provides that an arbitral award may be vacated "[w]here the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(4). However, "a showing of prejudice is a prerequisite to relief based on an arbitration panel's evidentiary rulings," including a failure to accept the submission of evidence. Employers Ins. of Wausau v. National Union Fire Ins., 933 F.2d 1481, 1490 (9th Cir.1991); see also Mutual Fire, Marine & Inland v. Norad Reinsurance Co., 868 F.2d 52, 57 (3d Cir.1989). Here, Nordell has neither alleged nor demonstrated that the refusal to accept its submission influenced the outcome of the arbitration. Thus, even if the refusal to accept the submission was wrongful, Nordell is not entitled to a vacation of the award. See id.
 
 2
 
 52
 Nordell also argues that the award must be set aside because the arbitrators were partial to Triton. Nordell alleges that the following facts demonstrate the partiality of the arbitrators: (1) the acceptance of a claim presented by Triton for the first time on the penultimate day of the hearing; (2) evidentiary rulings in favor of Triton; (3) the sealing of a witness's testimony and report; (4) the status of Armour, one of the arbitrators, as former general counsel of ARCO; and (5) the severity of the award against Nordell and Veronex.
 
 
 53
 Except for the severity of the award, each allegation relied upon by Nordell concerns either behavior by the arbitrators at the proceedings or facts known to Nordell prior to the proceedings. "[A]s a general rule, [a party] must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts." Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358-59 (6th Cir.), cert. denied, 493 U.S. 809 (1989); accord Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir.1985); Berstein Seawell & Kove v. Bosarge, 813 F.2d 726, 732 (5th Cir.1987); Cook Indus. Inc. v. C. Itoh & Co. (Am.) Inc., 449 F.2d 106, 108 (2d Cir.1971), cert. denied, 405 U.S. 921 (1972). A court "will not entertain a claim of personal bias where it could have been raised at the arbitration proceedings but was not." Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co., 866 F.2d 11, 13 (1st Cir.1989). Nordell did not assert its partiality claim at the hearing. To the contrary, Nordell emphasized its belief that the panel was impartial in its presentations before the arbitration panel. For example, in its closing argument, Nordell made the following statement:
 
 
 54
 I said it before and I'll say it again. I have never seen such interest and real concern on the part of arbitrators. And we all appreciate it and I thank you very much for everything. We've gotten a very fair and complete hearing. Thank you.
 
 
 55
 By failing to object to the partiality of the arbitrators to the arbitrators themselves, Nordell has waived any partiality complaint arising from the arbitrators' behavior at the hearing or Armour's previous affiliation with ARCO.
 
 
 56
 Nordell did not have a chance, however, to present to the arbitrators its argument that the severity of the award demonstrates their partiality. Thus, Nordell has not waived this argument, and we must consider its merit. An arbitral award may be vacated if the arbitrators acted with "evident partiality." 9 U.S.C. § 10(a)(4). "The burden of proving facts which would establish a reasonable impression of partiality rests squarely on the party challenging the award." Kinney, 756 F.2d at 745. The party alleging evident partiality must establish specific facts which indicate improper motivation on the part of the arbitration panel. Id. at 746. This provision has been interpreted very stringently. For example, unlike in the judicial context, the appearance of impropriety, standing alone, is insufficient to taint the award. Id. A district court's finding that there was no partiality on the part of an arbitration panel is reviewed for clear error. Id. at 747.
 
 
 57
 Although we have never considered whether the magnitude of an arbitral award can, by itself, give rise to an inference of partiality on the part of arbitrators, other courts have flatly rejected that possibility. See, e.g., Benjamin F. Shaw Co. v. Cincinnati Gas & Elec., 633 F.Supp. 841, 843 (S.D.Ohio 1968) ("Size of an award alone is not a sufficient basis for finding that the arbitrators are partial toward the winner."); see also MSP Collaborative Developers v. Fidelity & Deposit Co. of Md., 596 F.2d 247, 251 (7th Cir.1979) (construing the Indiana Uniform Arbitration Act, which was apparently modeled after the federal Act). Regardless whether there could ever be an award so disproportionate as to give rise to an inference of partiality, however, this award does not fall into that category. Each party had asked the arbitrators to restructure the relationship between them, and had indicated that the parties were no longer able to work together. The district court concluded that the "reasonable inference to be drawn from the award is the panel attempted to strike a compromise that would permit both parties to maintain an interest in the project without unduly hindering the further administration of the project." The court found that because "there are reasonable theories upon which the panel could have relied in making its Award," the award is not so inherently unfair as to give rise to an inference of partiality. Those findings are not clearly erroneous.
 
 
 58
 In short, we reject Nordell's contention that the award must be vacated because the panel was partial in favor of Triton.
 
 III
 
 59
 Veronex essentially makes two arguments in support of its position that the award against it must be vacated. First, Veronex argues that it did not agree to submit to the arbitrators' jurisdiction and thus is not bound by the arbitrators' decision. Second, Veronex argues that the arbitration panel exceeded its authority in deciding that Veronex is liable under the contract as the alter ego of Nordell because the parties did not submit that issue to the arbitrators for decision. This argument focuses on whether the arbitrators had the power to decide a particular issue, not whether they had jurisdiction over a party. We consider the second issue first.
 
 
 60
 * An arbitration panel exceeds its authority under section 10(a)(4) if it decides issues other than those submitted to it by the parties. Retail Store Employees Union Local 782 v. Sav-On Groceries, 508 F.2d 500, 503 (9th Cir.1975); Totem Marine Tug & Barge v. North Am. Towing, 607 F.2d 649, 651 (5th Cir.1979). Here, neither party explicitly requested a review of Veronex's rights and obligations under the contracts between Triton and Nordell. Triton sought relief solely from Nordell, not from Veronex. Moreover, neither party explicitly asked the panel to decide whether Veronex was the alter ego of Nordell.
 
 
 61
 However, any issue that is "inextricably tied up with the merits of the underlying dispute" is within the scope of the submission and may be addressed by the arbitration panel. McAllister Bros. v. A & S Transp. Co., 621 F.2d 519, 522-23 (2d Cir.1980); see also Nolde Bros. Inc. v. Local 358 Bakery and Confectionery Workers Union, 430 U.S. 243, 254 (1977). The affairs of Veronex and Nordell were inextricably intertwined. Veronex was highly involved in the making and performance of the contracts. For example, the record reflects that much of the correspondence about the project was conducted between Veronex and Triton. The arbitrators may have had to resolve the alter ego issue as a threshold question in order to make sense of the transactions involved. Under these circumstances, we conclude that the alter ego question was implicitly submitted for review and, thus, properly considered by the arbitrators.
 
 
 62
 Nordell could thus be bound by that determination. See Local No. 359 v. Arizona Mechanical & Stainless, 836 F.2d 647, 653 n. 6 (9th Cir.1988) (citing cases). Whether Veronex is also bound depends on whether the arbitrators had jurisdiction over Veronex. Id. We now turn to that question.
 
 B
 
 63
 The arbitration panel concluded that it had jurisdiction over Veronex because Veronex had ratified the agreement to arbitrate. Further, it implicitly rested its assumption of jurisdiction on the finding that Veronex was the alter ego of Nordell. The district court deferred to the arbitration panel's determination of its own jurisdiction.
 
 
 64
 The mere fact that Veronex ratified the agreement between Triton and Nordell, and thus agreed to arbitrate its disputes with Triton, does not in itself give the arbitrators the authority to enter an award against Veronex in this particular proceeding. Veronex was not named as a party to the proceeding. In the absence of the consent of the party, "arbitrators do not have power to add new parties to arbitration proceedings," Pacific Reinsurance v. Ohio Reinsurance, 935 F.2d 1019, 1026-27 (9th Cir.1991), and, by implication, cannot enter awards against non-parties.
 
 
 65
 If Veronex is the alter ego of Nordell, however, then Veronex can be bound by the award. Consent to arbitration may be implied from the voluntary submission of claims to the arbitrator. "A claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if decision is unfavorable, then challenge the authority of the arbitrator to act." George Day Constr. v. United Bhd. of Carpenters, 722 F.2d 1471, 1474 (9th Cir.1984). If Veronex is the alter ego of Nordell, when Nordell filed its demand for arbitration, thereby voluntarily submitting to the jurisdiction of the arbitration panel, Veronex submitted to the arbitrators' jurisdiction as well. In other words, when Nordell submitted claims against Triton, Veronex, if Nordell's alter ego, necessarily joined it. Veronex, however, is not necessarily bound by the arbitrators' determination that it is the alter ego of Nordell. Instead, Veronex has the right to an independent judicial determination of that issue. Arizona Mechanical & Stainless, 863 F.2d at 653; Laborers' Int'l Union v. Foster Wheeler Corp., 868 F.2d 573, 575-76 (3d Cir.1980). Veronex may have waived that right, however, by agreeing during the course of the proceedings to allow the arbitrators to make that determination. Cf. Ralph Andrews Prod. v. Writers Guild, 938 F.2d 128, 130 (9th Cir.1991) (appellant clearly reserved the issue of arbitrability for judicial determination). Whether Veronex waived this right is a factual determination that depends on the nature of Veronex's participation in the proceedings. We cannot make that determination based on the record before us; instead, such a factual determination must be made by the district court. We thus remand to the district court for a determination of whether Veronex consented to have the arbitrators decide the alter ego issue, and if Veronex did not consent, a de novo determination whether Veronex was in fact the alter ego of Nordell. See Arizona Mechanical & Stainless, 863 F.2d at 653.
 
 IV
 
 66
 In sum, we affirm the confirmation of the arbitration award against Nordell. We reverse the confirmation of the arbitration award against Veronex, and remand to the district court for further proceedings.
 
 
 67
 AFFIRMED in part, REVERSED in part, and REMANDED. Each party to bear its own costs.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Triton does not dispute that it is responsible for 60% of the costs of operating the project. The disputed issue concerns only whether Triton is obligated to make cash calls on itself
 
 
 [2]
 In light of our acceptance of the arbitrators' interpretation of the contract, Nordell's argument that the arbitrators acted in manifest disregard of the law in concluding that Nordell breached the contract must also fail. Nordell argues that by not making cash calls, Triton breached the contract, which in turn relieved Nordell of its obligations to perform. Since Triton had no obligation to make cash calls on itself, however, Nordell breached the contract when it ceased making the cash calls. The arbitrators did not act in manifest disregard of the law of contracts in making this determination
 
 
 [3]
 Since we will not contravene the arbitrators' implicit factual finding that the data were reliable, we reject Nordell's contention that the arbitrators acted in manifest disregard of the law by ignoring the unclean hands doctrine
 
 
 [4]
 The full text of the relevant provision of the interim order is as follows:
 Each of the parties are [sic] ordered to take no actions to prejudice the interests of the other party or parties prior to the conclusion of the arbitration proceeding and each should fulfill its respective obligations and perform its duties under the agreements in existence or at issue so as not to alter the status quo or position of any other party.