**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, Plaintiff,**

v.

**NATIONAL FOOTBALL LEAGUE, and National Football League Management Council, Defendants.**

**Kevin Williams and Pat Williams, Plaintiffs,**

v.

**National Football League, John Lombardo, M.D., Brian Finkle, and Adolpho Birch, Defendants.**

**Civil Nos. 08–6254 (PAM/JJG), 08–6255 (PAM/JJG).**

United States District Court, D. Minnesota.

Dec. 11, 2008.

Anthony N. Kirwin, Edward M. Glennon, Mark A. Jacobson, Lindquist & Vennum PLLP, Minneapolis, MN, David G. Feher, David L. Greenspan, Jeffrey L. Kessler, Dewey & LeBoeuf, LLP, New York, NY, for Plaintiff.

Daniel L. Nash, Akin Gump Strauss Hauer & Feld, Washington, DC, Joseph G. Schmitt, Halleland Lewis Nilan & Johnson, Minneapolis, MN, Kelly–Na Smith, Marla–Na Axelrod, Stacey–Na Eisenstein, for Defendants.

**MEMORANDUM AND ORDER**

PAUL A. MAGNUSON, District Judge.

This matter is before the Court on the Motion for Preliminary Injunction filed in case 08–6254 by the National Football League Players Association, and Defendants' Motion to Dissolve the temporary restraining order ("TRO") in case 08–6255. On December 5, 2008, after hearing the oral arguments of the parties, the Court temporarily granted the Motion for Preliminary Injunction and denied the Motion to Vacate, finding that the complexity of the case demanded preservation of the status quo to allow the Court to give full consideration to the issues involved. The Court has now carefully reviewed the parties' submissions. Based on those submissions and the arguments of counsel, the Court determines that extension of the preliminary injunction is warranted.

## BACKGROUND

### A. Facts

On Tuesday, December 2, 2008, a Hearing Officer upheld two labor arbitration awards that suspended for the remaining four weeks of the season five players in the National Football League ("NFL"): Kevin Williams and Pat Williams of the Minnesota Vikings and Charles Grant, Deuce McAllister, and Will Smith of the New Orleans Saints. The players all tested positive for the diuretic bumetanide and were suspended pursuant to the NFL's Policy on Anabolic Steroids and Related Substances (the "Policy"). The Policy lists bumetanide as a banned substance and provides that "[t]he *first* time a player violates this Policy by testing positive [for a banned substance] . . . he will be suspended without pay for a minimum of four regular and/or postseason games." (Jacobson Decl. Ex. A (hereinafter "Policy") at ¶ 6 (emphasis in original).) The Policy imposes strict liability on players—in other words, "a positive test result will not be excused because a player was unaware that he was taking a [banned substance]." (*Id.* at ¶ 3.E.)

Defendant Dr. John Lombardo is the "Independent Administrator" of the Policy. (*Id.* at Appx. B.) Defendant Dr. Bryan Finkle is the "Consulting Toxicologist." (*Id.*) As the Independent Administrator, Lombardo is solely responsible for administering the testing regimen, analyzing test results (in consultation with Finkle), and certifying violations of the Policy. (*Id.* at ¶ 2.) In addition, Lombardo is responsible for consulting with players and team physicians and for developing educational materials. (*Id.*) The Policy directs players with questions about a specific supplement to call either Lombardo or the NFL Supplement Hotline (the "Hotline"). (*Id.* at ¶ 3.E.)

The facts show that the players tested positive after they took an over-the-counter weight-loss supplement called Star-Caps. Bumetanide is not listed on the label as an ingredient in StarCaps, but there is no dispute that StarCaps contains bumetanide. The National Football League Players Association ("NFLPA" or "union") contends, and the NFL [1] does not dispute, that the players unknowingly ingested bumetanide. Bumetanide is banned under the Policy because it can mask the presence of steroids, but there is no allegation that the players' use of Star-Caps was intended to mask steroid use. There is also no allegation that the players took any anabolic steroid. The NFLPA contends that Lombardo, Finkle, and Defendant Adolpho Birch (the NFL's Vice President of Law and Labor Policy) knew as early as 2006 that StarCaps contained bumetanide but deliberately failed to communicate this information to players or the union.

The NFL does not deny that Lombardo, Finkle, and Birch knew that StarCaps contained bumetanide. Indeed, the NFL concedes that Lombardo and Finkle directed a laboratory to perform tests on StarCaps and that those tests determined that Star-Caps contained bumetanide. The results of the tests were published in the November/December 2007 *Journal of Analytical Toxicology.* (Jacobson Decl. Ex. C at 5.) Despite this knowledge, the NFL contends that they had no duty to warn players specifically about StarCaps, because the Policy provides that players are responsible for what is in their own bodies, and also warns players about using over-the-counter supplements. (*See* Policy at ¶ 3.E and Appx. F.) Indeed, the Policy notes that over-the-counter supplements may not

---

**1.** "NFL" as used here refers to both the NFL and the NFL Management Council, in addition to the individually named Defendants in Civ. No. 08–6255.

"contain the ingredients listed on the packaging." (*Id.* Appx. F.)

After the players were notified about their positive tests, each requested a hearing under the Policy. (*Id.* at ¶ 10.) The Policy provides that "the Commissioner or his designee will preside as Hearing Officer." (*Id.*) The Commissioner designated Jeffrey Pash, the NFL's chief legal officer, to act as the Hearing Officer. Mr. Pash held two hearings, one on the Williamses' appeal and one on the appeal of Grant, McAllister, and Smith. As noted by the substantively identical arbitration awards Mr. Pash issued in each matter, the players argued that their violations of the Policy "should be excused because the NFL and Dr. Lombardo were aware that Star-Caps contained an undisclosed banned substance, bumetanide, but did not specifically advise NFL players of this fact." (Jacobson Decl. Ex. C at 7.) Although the players did not contend that either the NFL or Lombardo had a duty to test specific supplements for banned substances, they argued that "where, as here, the testing process leads to specific information about a specific product, . . . the league and Dr. Lombardo have a duty to inform NFL players. . . ." (*Id.*)

The testimony at the hearing showed that none of the players contacted Lombardo about StarCaps, although at least one player did ask a team trainer to call the Hotline to ask about StarCaps. According to the player, the Hotline told the trainer that StarCaps did not contain any banned substances. Others testified that the Hotline did not offer information about specific supplements, but rather warned callers to avoid supplements altogether. In addition, Lombardo himself testified that, had any player asked him specifically about StarCaps, he would "strongly urge [the player] not to take the product" because "weight reduction products historically have either a diuretic or a stimulant."

(*Id.* at 6 (quoting Tr. at 100, 105–106).) Notably, Lombardo did not testify that he would have told the player that StarCaps contained a banned substance.

Ultimately, Mr. Pash upheld the players' suspensions:

> The rule puts the burden on players to be responsible and accountable for what is in their bodies. It avoids complex issues of intent and ensures that all players will be treated equally under the Policy. It establishes a simple and straightforward—if admittedly inflexible—rule to guide player conduct and administration of the Policy. Based on this record, there is no question that each of these players have [sic] heard and understood those warnings and know that they are responsible for what is in their bodies.

(*Id.*) He found that the Policy did not impose a burden on the NFL or Lombardo to warn players about specific supplements, determining that the general warnings about supplements should have served as notice to the players that any use of supplements could lead to a positive test result. (*See, e.g., id.* at 8.)

## B. Procedural Posture

After receiving Mr. Pash's decision, Kevin Williams and Pat Williams brought suit in Minnesota state court, alleging that their impending suspensions violated Minnesota law. Judge Gary Larson of the Hennepin County District Court entered a TRO on Thursday, December 3, 2008, against the Williamses' suspensions. The NFLPA filed its lawsuit in federal court the next day, alleging that the suspensions of all five players violated federal law. That same day, the NFL removed the Williamses' case to this Court.

The NFLPA asks for an injunction against the suspensions in order to preserve the status quo. It contends that,

absent an injunction, the players and their teams will suffer irreparable harm. The NFL opposes the entry of a preliminary injunction and seeks to vacate the state-court TRO. The NFL contends that the players and the NFLPA cannot challenge the arbitrator's decision because the Collective Bargaining Agreement ("CBA") provides that such decisions are final and binding on the parties. The NFL also argues that the Williamses' state-law claims are preempted by federal law.

## DISCUSSION

### A. Preemption

In its Motion to Vacate the TRO, the NFL argues that the Williamses' state-law claims are preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The NFL does not, however, move to dismiss those claims on preemption grounds, instead arguing that because the claims are preempted, the Williamses cannot show a likelihood that they will succeed on the merits of the claims.

 The LMRA preempts state-law tort claims that "are 'substantially dependent' upon an analysis of the terms or provisions of a collective bargaining agreement or are 'inextricably intertwined' with consideration of the terms or provisions of a collective bargaining agreement...." *Oberkramer v. IBEW–NECA Serv. Ctr., Inc.*, 151 F.3d 752, 756 (8th Cir.1998) (quoting *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)). There is no question that the Williamses' claims, as currently

framed, depend on the Policy.[2] Thus, it is likely that those claims are preempted by the LMRA. For the purposes of these Motions, the Court will consider the Williamses' claims as arising under § 301 of the LMRA. *See Allis–Chalmers*, 471 U.S. at 220, 105 S.Ct. 1904 (holding that where state-law claim requires analysis of terms of labor agreement, court may either treat claim as a § 301 claim or dismiss claim as preempted). Therefore, and for the purposes of these Motions only, the Court will treat the Williamses' claims as substantially identical to the NFLPA's claims, and will evaluate simultaneously all Plaintiffs' claims of entitlement to equitable relief. The Court will refer to Plaintiffs collectively as the NFLPA, except where only the Williamses' claims are at issue.

### B. Preliminary Injunction

 A preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits, (2) that the movant will suffer irreparable harm absent the injunction, (3) that the balance of harms favors the movant, and (4) that the public interest favors the movant. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). Injunctive relief is considered to be a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed.Cir.1993).

 The NFL contends that the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.*,

---

**2.** At the oral argument on these Motions, counsel for the Williamses indicated that the Williamses intended to file an Amended Complaint, raising claims that the Policy conflicts with various Minnesota statutes. Such claims may not be preempted. "Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law.... [Therefore] it

would be inconsistent with congressional intent ... to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Allis–Chalmers*, 471 U.S. at 212, 105 S.Ct. 1904. However, given that the TRO was entered on the Williamses' claims in their initial Complaint, the Court will examine only those allegations in resolving the preemption question.

prohibits the Court from entering any injunctive relief in a labor case such as this. Courts have invoked the Act to deny injunctive relief when the movant seeks to enjoin a broad policy or rule. *See, e.g., Powell v. Nat'l Football League,* 690 F.Supp. 812 (D.Minn.1988) (Doty, J.) (denying request for injunction against free agency policy); *Nat'l Football League Players Ass'n v. Nat'l Football League,* 724 F.Supp. 1027 (D.D.C.1989) (denying request for injunction against steroid policy). The Act, however, is not a blanket prohibition on any injunction in a labor case. *See, e.g., Jackson v. Nat'l Football League,* 802 F.Supp. 226, 233 (D.Minn. 1992) (Doty, J.) (finding that the Act did not bar a TRO because "such relief will not undermine any labor policy set forth in the Act"); *Int'l Bhd. of Elec. Workers v. Potomac Elec. Power Co.,* 634 F.Supp. 642, 643 (D.D.C.1986) (court may enter injunction "where the integrity of the arbitration process would be threatened absent interim relief"). Here, the NFLPA does not seek an injunction against the Policy as a whole but rather only against the suspensions of particular players whose arbitration awards, according to the NFLPA, are tainted by the NFL's conduct.

The Act provides that "[n]o court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter...." 29 U.S.C. § 101. Under the Act, an injunction may issue only if the Court finds (1) that illegal acts either have been committed or are threatened to be committed; (2) that the movant will suffer irreparable harm; (3) that the balance of harms weighs in favor of the movant; (4) that there is no adequate remedy at law; and (5) that "the public officers charged with the duty to protect [movant's] property are unable or unwilling to furnish adequate protection." 29 U.S.C. § 107; *see*

*also Jackson,* 802 F.Supp. at 234 ("Even if the court were to apply the Act to the present case, injunctive relief may still issue based on the evaluation of the traditional factors underlying such relief...."). The Act echoes the *Dataphase* factors listed above, with the addition of a fifth factor that has no relevance to this case. Thus, the Court finds that, should the NFLPA succeed in establishing the *Dataphase* factors listed above, preliminary injunctive relief is appropriate. *See, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) ("A district court entertaining an action under § 301 may not grant injunctive relief ... unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris–LaGuardia Act.").

### 1. Likelihood of Success on the Merits

The NFLPA seeks to vacate the arbitration awards that suspended the players. (*See* Compl. in Civ. No. 08–6254, at ¶¶ 43–49.) They contend that the suspensions violate public policy, are contrary to the essence of the CBA, and that the partiality of the arbitrator warrants setting those suspensions aside. (*Id.* at ¶ 45.)

The NFLPA acknowledges that a party seeking to set aside an arbitration award bears a very high burden. However, on a motion for preliminary relief, the NFLPA need not show a greater than fifty percent likelihood that it will prevail on the merits of its claims. Rather,

the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined....

In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is

meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less. . . .

[W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Dataphase*, 640 F.2d at 113. Because the Court finds that the balance of the equities strongly favors the NFLPA, as discussed below, the Court will examine whether the NFLPA has raised a "substantial question" on the merits of its claim that the Hearing Officer's decision should be set aside.

### a. *Partiality of hearing officer*

■ An arbitration award may be set aside if the Court determines that the arbitrator was biased. *See, e.g., Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358–59 (6th Cir.1989) (applying Federal Arbitration Act's "evident partiality" standard to arbitration award involving collective bargaining agreement); *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79 (2d Cir.1984) (same). Section 10 of the Federal Arbitration Act provides

that a court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrator[ ]." 9 U.S.C. § 10(a)(2).

The NFLPA argues that Mr. Pash was biased because his office was directly implicated in the NFL's failure to inform players that StarCaps contained a banned substance. The NFL responds that because the Policy specifically provides that the Commissioner or his designee will preside over any arbitration, the NFLPA agreed to Mr. Pash presiding over the hearing and therefore waived any challenge to Mr. Pash.

In agreeing that the Commissioner or his designee would preside over hearings under the Policy, the NFLPA agreed to a certain amount of partiality in the arbitrator.[3] Thus, "the award should be confirmed unless the objecting party proves that the arbitrator's partiality prejudicially affected the award." *Winfrey v. Simmons Foods, Inc.*, 495 F.3d 549, 551 (8th Cir. 2007).

It is plain that the involvement of Mr. Pash's office and Birch, Mr. Pash's subordinate, in the alleged conduct rendered Mr. Pash a partial arbitrator. At the oral arguments on the pending Motions, counsel for the NFLPA discussed Birch's arbitration hearing testimony. Birch was asked whether he reported the information about StarCaps to either Mr. Pash or the Commissioner. He refused to answer the question, and Mr. Pash upheld his refusal to answer. This exchange alone casts substantial doubt on Mr. Pash's neutrality.

■ The NFLPA has succeeded in establishing that a substantial question ex-

---

**3.** The Court does not determine at this time that the NFLPA agreed to the specific bias alleged here. It is for another day to determine whether in fact the parties anticipated that the arbitrator would be implicated in the wrongdoing alleged. For the moment, the Court will assume without deciding that the NFLPA waived any challenge to Mr. Pash's partiality as a basis for vacating the award *ab initio*.

ists as to whether Mr. Pash's connection to the allegations in this case prejudicially affected the award. Although Mr. Pash's decisions are well reasoned, he glossed over the rather shocking allegations the NFLPA makes. Moreover, he did not take into account Lombardo's testimony that, even if asked about StarCaps in particular, he would merely warn the player away from supplements in general. Such testimony calls into question the very basis of the NFL's position on banned substances. The NFL maintains that its strict liability policy is fair in part because players may contact either Lombardo or the Hotline with questions about specific supplements. If players cannot get answers to their questions, however, they cannot determine which supplements are permissible and which are not. While it is true that the NFL discourages the use of all weight-loss supplements, such supplements are not forbidden and the players reasonably expect to rely on the advice of Lombardo and the Hotline with respect to such substances. Mr. Pash's failure to take Lombardo's testimony into account is substantial evidence that the arbitration award was prejudiced by Mr. Pash's partiality. The NFLPA is entitled to a preliminary injunction to preserve the status quo until a full hearing can be held on the issue of Mr. Pash's partiality and the effect of any partiality on the arbitration awards at issue.

### b. *Essence of the CBA*

■ An arbitration award that fails to "draw[ ] its essence from the collective bargaining agreement" is not entitled to deference from the reviewing Court. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The NFLPA argues that the arbitration awards here should be vacated because they are contrary to one of the stated goals of the Policy: the "concern[ ] with the adverse health effects of

using Prohibited Substances." (Policy at ¶ 1.) The NFLPA contends that "the Arbitration Awards undeniably put the health of NFL players at serious risk by depriving them of critical information about the ingredients in StarCaps—the exact opposite of the Policy's stated goal." (Pl.'s Supp. Mem. at 26.)

The Court's authority to reverse an arbitration award for failure to comply with the Policy is "exceptionally narrow." *Coca–Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688*, 959 F.2d 1438, 1440 (8th Cir.1992). "[A]s long as the arbitrator is even arguably construing or applying the [Policy] and acting within the scope of his authority," the Court's determination that the arbitrator "committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct. 364.

■ Mr. Pash's decisions on the players' appeals are thorough and, as noted above, well reasoned. He discussed the aims of the Policy, which include protecting the health of players, but determined that the overriding goal of the Policy is one of strict liability: players must be responsible for what is in their bodies. He determined that the Policy imposes no obligation on either the NFL or Lombardo to warn players about specific supplements. While the NFLPA may disagree with these conclusions, it has not established that Mr. Pash ignored the plain language of the Policy or misapplied the Policy. *See Iowa Mold Tooling Co. v. Teamsters Local Union No. 828*, 16 F.3d 311, 312 (8th Cir.1994) (noting that arbitrator may not ignore plain language of contract). Rather, the NFLPA's argument is that Mr. Pash's decisions do not further the goals of the Policy. That argument is not sufficient to vacate the awards for failure to draw their essence from the Policy. Thus, the NFLPA has not raised a substantial

question as to whether the awards should be vacated on this basis.

### c. *Public policy*

■ "If the [Policy] as interpreted by [Mr. Pash] violates some explicit public policy, [the Court is] obliged to refrain from enforcing it." *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). It is not enough, however, for the party challenging the arbitration award to argue that the award violates a general public policy. Rather, the relevant public policy "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)).

The NFLPA asserts that the arbitration awards violate public policy "because they sanction Defendants' knowing and intentional breach of fiduciary duty" and thereby sanction behavior that threatens the players' health and safety. (Pl.'s Supp. Mem. at 17.) To succeed in establishing that a substantial question exists as to the claim that the awards should be vacated as against public policy, the NFLPA must raise a substantial question as to whether (1) a fiduciary duty exists, (2) fiduciary duties are an explicit public policy interest, and (3) the arbitration awards violated that public policy interest.

■ The NFLPA contends that the NFL, Lombardo, and Birch owed the players a fiduciary duty under New York law[4] because the Policy provided that players could contact Lombardo or the NFL-administered Hotline with questions about supplements, and because Lombardo had the duty under the Policy to consult with players and to educate players about banned substances. The NFL does not

respond to this argument and thus appears to concede for the purposes of this Motion that the NFLPA has at least raised a substantial question as to whether the NFL, Lombardo, and Birch owed the players a fiduciary duty with respect to communicating information about banned substances under the Policy.

■ Under New York law, fiduciary duties are a matter of public policy. *See, e.g., Tzolis v. Wolff,* 10 N.Y.3d 100, 855 N.Y.S.2d 6, 884 N.E.2d 1005, 1009 (2008) (noting that the New York legislature has declared it the public policy of New York to allow lawsuits that serve to deter breaches of fiduciary duties); *see also Kinney v. Glenny,* 136 Misc. 301, 240 N.Y.S. 713, 717 (N.Y.Sup.Ct.1930) ("[A]ll acts of an agent which tend to violate his fiduciary duty are regarded as frauds upon the confidence bestowed and are not only invalid as to the principal, but are also against public policy."), *rev'd on other grounds,* 231 A.D. 311, 247 N.Y.S. 119 (1931). New York's public policy in enforcing fiduciary duties is an explicit public policy, and as such may serve as the basis for vacating an arbitration award.

As discussed above in Section B.1.a. in the context of evaluating Mr. Pash's alleged bias, the Policy's strict liability stance takes its authority in part from its assurances that players may seek advice from Lombardo and from the Hotline. Yet Lombardo testified that he would have only offered general warnings about supplements even if questioned about Star-Caps in particular, and one player testified that the Hotline told his representative that there were no banned substances in StarCaps. The arbitration awards do not acknowledge these serious apparent breaches of fiduciary duties, nor do the awards discuss the effect of these breaches

---

4. There appears to be no dispute that New York law governs the fiduciary duty issue.

on the merits of the players' appeals. Thus, the awards do appear to sanction the apparent breaches of fiduciary duties. As such, the awards may violate the public policy of the state of New York.

■ The NFLPA has established that a substantial question exists as to whether the awards violate public policy.[5] Thus, for the purposes of preliminary relief, the NFLPA has demonstrated a likelihood that it will succeed on the merits of its claims that the awards should be vacated because they violate public policy.

### 2. Irreparable Harm

The NFL argues that, even if the NFLPA can show a likelihood of success on the merits of its claims, it cannot establish that the players will suffer any irreparable harm and therefore injunctive relief is inappropriate. *See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir.1989) (en banc) (injunction may not issue without a showing of irreparable harm). According to the NFL, each player's "lost playing time, prestige, and the impact of his suspension on his team's playoff chances" are merely "an inherent result of the suspension process" and do not constitute irreparable harm. (Defs.' Opp'n Mem. at 19.) The NFL's position, however, begs the question. If the players' suspensions were proper, then those suspensions cannot constitute irreparable harm. Improper suspensions, however, can undoubtedly result in irreparable harm. *See Jackson,* 802 F.Supp. at 230–31 (finding that the players made "a sufficient showing of irreparable harm because they suffer irreparable injury each week that they remain restricted under an illegal system of player restraints.").

■ The players are certainly harmed by the impending suspensions. As the NFLPA argues, a player who has been suspended under the Policy is ineligible for post-season awards such as the Pro–Bowl. Those honors carry significant economic and non-economic benefits. Moreover, at least some of the players are central to their team's chances of making the playoffs. The failure to make the playoffs and the effect of that failure on the players, teams, and fans is not compensable monetarily and is therefore an irreparable harm.

Suspending a player for testing positive for a banned substance when there are such substantial questions about the facts and circumstances surrounding the specific supplement at issue irreparably harms the player. "The existence of irreparable injury is underscored by the undisputed brevity and precariousness of the players' careers in professional sports, particularly in the NFL." *Id.* at 231; *see also Linseman v. World Hockey Ass'n,* 439 F.Supp. 1315, 1319 (D.Conn.1977) ("[T]he career of a professional athlete is more limited than that of persons engaged in almost any other occupation."). Not only does the player lose playing time, but his reputation may be irretrievably tarnished. Banned substances "threaten the fairness and integrity of the athletic competition on the playing field." (Policy at ¶ 1.) Thus, being accused of using such substances is akin to being accused of cheating. Where, as here, there are substantial questions about the process used to suspend these players

---

5. The NFLPA also contends that the awards violate public policy because they endanger players' health. Because the Court has determined that the NFLPA has raised a substantial question as to whether the awards violate the public policy of enforcing fiduciary duties, the Court will leave to another day the determination whether arbitration awards that may endanger the health of a small group of people, such as professional football players, can be vacated as violating public policy.

for their inadvertent use of a banned substance, the harm to the players from such suspensions is clearly irreparable.

### 3. Balance of Harms

■ Both the NFL and the NFLPA have an interest in the enforcement of the Policy. The NFL contends that this interest will be harmed by an injunction against the suspensions at issue because such an injunction will encourage players to challenge their suspensions in court and render meaningless the Policy's imposition of strict liability. The Court disagrees. The facts of this case are unusual, and it is only because of those unusual facts that this Court has entertained the Motion for Preliminary Injunction. The Court's analysis applies only to the factual situation present here and does not provide any authority that other suspensions under the Policy are in any way improper or challengeable. Moreover, the parties' interest in the enforcement of the Policy can only be an interest in the proper enforcement of that Policy. Thus, both the NFLPA and the NFL have an interest in ensuring that the suspensions meted out under the Policy are not tainted by alleged bias and wrongdoing.

Given that the NFLPA has established the threat of irreparable harm absent the issuance of an injunction and the NFL has not established that it will suffer any harm if an injunction issues, the balance of harm weighs decidedly in favor of granting an injunction.

### 4. Public Interest

■ In Section B.1.c. above, the Court discussed the public policy implications of the fiduciary duty allegations the NFLPA makes. Because of the strong public policy of deterring breaches of fiduciary duty, the public interest weighs in favor of an injunction here. Similarly, as courts have recognized for more than a century, the public interest lies in ensuring that innocent people are not subject to unjust punishment. *See, e.g., Shephard v. Whetstone,* 51 Iowa 457, 1 N.W. 753, 754 (1879) ("The punishment of an innocent person ... has no tendency to subserve the public interest ...."); *see also United States v. Keegan,* 71 F.Supp. 623, 626 (S.D.N.Y.1947) ("[I]t is distasteful to the public generally ... to think that an entirely innocent person is ever punished for a crime."). If the suspensions at issue are improper, then allowing those suspensions to go forward violates the public interest.

The NFLPA has succeeded in establishing that the public interest weighs in favor of a preliminary injunction.

### 5. Conclusion

All of the *Dataphase* factors weigh in favor of granting the preliminary injunction the NFLPA seeks. The Court will therefore extend the previously granted Preliminary Injunction.

### C. Proceedings Going Forward

The Court encourages the parties to continue to work toward a non-judicial solution to this matter. If the parties are unable to do so, it is the Court's intention to hold a full evidentiary hearing on the merits as soon as practicable. The parties must first have an opportunity, however, to complete the pleading process to ensure that the Court has all claims before it prior to ruling on the merits.

It is the Court's preference that the parties, in consultation with the Court, agree on a schedule for filing pleadings and for briefing with respect to the evidentiary hearing. To that end, the parties shall provide the Court with a joint proposed scheduling order on or before Monday, December 22, 2008. Should the parties be unable to reach agreement on a schedule, the Court will determine the appropriate schedule for this matter.

## CONCLUSION

The NFLPA has demonstrated that it is entitled to preliminary injunctive relief to preserve the status quo so that the Court can entertain a hearing on the merits of this complicated and contentious matter. The Court will therefore extend the preliminary injunction entered on December 5, 2008, until a full hearing on the parties' claims can be held.

Accordingly, **IT IS HEREBY ORDERED that** the Preliminary Injunction entered on December 5, 2008 (Docket No. 21 in 08–6254) shall remain in full force and effect until terminated or altered by further Order of this Court.